RAINES, DIRECTOR, OFFICE OF MANAGEMENT
AND BUDGET, ET AL. *v.* BYRD ET AL.

No. 96–1671.   Argued May 27, 1997—Decided June 26, 1997

812

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, THOMAS, and GINSBURG, JJ., joined. SOUTER, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined, *post*, p. 830. STEVENS, J., *post*, p. 835, and BREYER, J., *post*, p. 838, filed dissenting opinions.

*Acting Solicitor General Dellinger* argued the cause for appellants. With him on the briefs were *Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Malcolm L. Stewart,* and *Douglas N. Letter.*

*Alan B. Morrison* argued the cause for appellees. With him on the briefs were *Lloyd N. Cutler, Louis R. Cohen, Charles J. Cooper, Michael A. Carvin, David Thompson,* and *Michael Davidson.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.†

The District Court for the District of Columbia declared the Line Item Veto Act unconstitutional. On this direct appeal, we hold that appellees lack standing to bring this suit,

---

*\*Thomas B. Griffith, Morgan J. Frankel, Steven F. Huefner, Geraldine R. Gennet, Kerry W. Kircher,* and *Michael L. Stern* filed a brief for the United States Senate et al. as *amici curiae* urging reversal.

Briefs of *amicus curiae* urging affirmance were filed for the Association of the Bar of the City of New York by *David P. Felsher, Louis A. Craco, Jr.,* and *James F. Parver;* and for David Schoenbrod et al. by *Mr. Schoenbrod,* pro se, and *Marci A. Hamilton,* pro se.

*G. William Frick* filed a brief for the American Petroleum Institute as *amicus curiae.*

†JUSTICE GINSBURG joins this opinion.

and therefore direct that the judgment of the District Court be vacated and the complaint dismissed.

## I

The appellees are six Members of Congress, four of whom served as Senators and two of whom served as Congressmen in the 104th Congress (1995–1996).[1] On March 27, 1996, the Senate passed a bill entitled the Line Item Veto Act by a vote of 69 to 31. All four appellee Senators voted "nay." 142 Cong. Rec. S2995. The next day, the House of Representatives passed the identical bill by a vote of 232 to 177. Both appellee Congressmen voted "nay." *Id.*, at H2986. On April 4, 1996, the President signed the Line Item Veto Act (Act) into law. Pub. L. 104–130, 110 Stat. 1200, codified at 2 U. S. C. § 691 *et seq.* (1994 ed., Supp. II). The Act went into effect on January 1, 1997. See Pub. L. 104–130, § 5. The next day, appellees filed a complaint in the District Court for the District of Columbia against the two appellants, the Secretary of the Treasury and the Director of the Office of Management and Budget, alleging that the Act was unconstitutional.

The provisions of the Act do not use the term "veto." Instead, the President is given the authority to "cancel" certain spending and tax benefit measures after he has signed them into law. Specifically, the Act provides:

"[T]he President may, with respect to any bill or joint resolution that has been signed into law pursuant to Article I, section 7, of the Constitution of the United States, cancel in whole—(1) any dollar amount of discretionary budget authority; (2) any item of new direct spending; or (3) any limited tax benefit; if the President—

---

[1] Three of the Senators—Robert Byrd, Carl Levin, and Daniel Patrick Moynihan—are still Senators. The fourth—Mark Hatfield—retired at the end of the 104th Congress. The two Congressmen—David Skaggs and Henry Waxman—remain Congressmen.

"(A) determines that such cancellation will—(i) reduce the Federal budget deficit; (ii) not impair any essential Government functions; and (iii) not harm the national interest; and

"(B) notifies the Congress of such cancellation by transmitting a special message . . . within five calendar days (excluding Sundays) after the enactment of the law [to which the cancellation applies]." § 691(a) (some indentations omitted).

The President's "cancellation" under the Act takes effect when the "special message" notifying Congress of the cancellation is received in the House and Senate. With respect to dollar amounts of "discretionary budget authority," a cancellation means "to rescind." § 691e(4)(A). With respect to "new direct spending" items or "limited tax benefit[s]," a cancellation means that the relevant legal provision, legal obligation, or budget authority is "prevent[ed] . . . from having legal force or effect." §§ 691e(4)(B), (C).

The Act establishes expedited procedures in both Houses for the consideration of "disapproval bills," § 691d, bills or joint resolutions which, if enacted into law by the familiar procedures set out in Article I, § 7, of the Constitution, would render the President's cancellation "null and void," § 691b(a). "Disapproval bills" may only be one sentence long and must read as follows after the enacting clause: "That Congress disapproves of cancellations _____ as transmitted by the President in a special message on _____ regarding _____ ." § 691e(6)(C). (The blank spaces correspond to the cancellation reference numbers as set out in the special message, the date of the President's special message, and the public law number to which the special message relates, respectively. *Ibid.*)

The Act provides that "[a]ny Member of Congress or any individual adversely affected by [this Act] may bring an action, in the United States District Court for the District of Columbia, for declaratory judgment and injunctive relief on

the ground that any provision of this part violates the Constitution." § 692(a)(1). Appellees brought suit under this provision, claiming that "[t]he Act violates Article I" of the Constitution. Complaint ¶ 17. Specifically, they alleged that the Act "unconstitutionally expands the President's power," and "violates the requirements of bicameral passage and presentment by granting to the President, acting alone, the authority to 'cancel' and thus repeal provisions of federal law." *Ibid.* They alleged that the Act injured them "directly and concretely . . . in their official capacities" in three ways:

> "The Act . . . (a) alter[s] the legal and practical effect of all votes they may cast on bills containing such separately vetoable items, (b) divest[s] the [appellees] of their constitutional role in the repeal of legislation, and (c) alter[s] the constitutional balance of powers between the Legislative and Executive Branches, both with respect to measures containing separately vetoable items and with respect to other matters coming before Congress." *Id.*, ¶ 14.

Appellants moved to dismiss for lack of jurisdiction, claiming (among other things) that appellees lacked standing to sue and that their claim was not ripe. Both sides also filed motions for summary judgment on the merits. On April 10, 1997, the District Court (i) denied appellants' motion to dismiss, holding that appellees had standing to bring this suit and that their claim was ripe, and (ii) granted appellees' summary judgment motion, holding that the Act is unconstitutional. 956 F. Supp. 25. As to standing, the court noted that the Court of Appeals for the District of Columbia "has repeatedly recognized Members' standing to challenge measures that affect their constitutionally prescribed lawmaking powers." *Id.*, at 30 (citing, *e. g., Michel* v. *Anderson*, 14 F. 3d 623, 625 (CADC 1994); *Moore* v. *U. S. House of Representatives*, 733 F. 2d 946, 950–952 (CADC 1984)). See also 956

F. Supp., at 31 ("[T]he Supreme Court has never endorsed the [Court of Appeals'] analysis of standing in such cases"). The court held that appellees' claim that the Act "dilute[d] their Article I voting power" was sufficient to confer Article III standing: "[Appellees'] votes mean something different from what they meant before, for good or ill, and [appellees] who perceive it as the latter are thus 'injured' in a constitutional sense whenever an appropriations bill comes up for a vote, whatever the President ultimately does with it. . . . Under the Act the dynamic of lawmaking is fundamentally altered. Compromises and trade-offs by individual lawmakers must take into account the President's item-by-item cancellation power looming over the end product." *Ibid.*

The court held that appellees' claim was ripe even though the President had not yet used the "cancellation" authority granted him under the Act: "Because [appellees] now find themselves in a position of unanticipated and unwelcome subservience to the President before and after they vote on appropriations bills, Article III is satisfied, and this Court may accede to Congress' directive to address the constitutional cloud over the Act as swiftly as possible." *Id.,* at 32 (referring to § 692(a)(1), the section of the Act granting Members of Congress the right to challenge the Act's constitutionality in court). On the merits, the court held that the Act violated the Presentment Clause, Art. I, § 7, cl. 2, and constituted an unconstitutional delegation of legislative power to the President. 956 F. Supp., at 33, 35, 37–38.

The Act provides for a direct, expedited appeal to this Court. § 692(b) (direct appeal to Supreme Court); § 692(c) ("It shall be the duty of . . . the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any [suit challenging the Act's constitutionality] brought under [§ 3(a) of the Act]"). On April 18, eight days after the District Court issued its order, appellants filed a jurisdictional statement asking us to note probable jurisdiction, and on April 21, appellees filed a

memorandum in response agreeing that we should note probable jurisdiction. On April 23, we did so. 520 U. S. 1194 (1997). We established an expedited briefing schedule and heard oral argument on May 27.[2] We now hold that appellees have no standing to bring this suit, and therefore direct that the judgment of the District Court be vacated and the complaint dismissed.

## II

Under Article III, § 2, of the Constitution, the federal courts have jurisdiction over this dispute between appellants and appellees only if it is a "case" or "controversy." This is a "bedrock requirement." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 471 (1982). As we said in *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 37 (1976): "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."

One element of the case-or-controversy requirement is that appellees, based on their complaint, must establish that they have standing to sue. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992) (plaintiff bears burden of establishing standing). The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit, *Simon, supra*, at 38, although that inquiry "often turns on the nature and source of the claim asserted," *Warth* v. *Seldin*, 422 U. S. 490, 500 (1975). To meet the standing requirements of Article III, "[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen* v. *Wright*, 468

---

[2] The House Bipartisan Legal Advisory Group (made up of the Speaker, the Majority Leader, the Minority Leader, and the two Whips) and the Senate filed a joint brief as *amici curiae* urging that the District Court be reversed on the merits. Their brief states that they express no position as to appellees' standing.

U. S. 737, 751 (1984) (emphasis added). For our purposes, the italicized words in this quotation from *Allen* are the key ones. We have consistently stressed that a plaintiff's complaint must establish that he has a "personal stake" in the alleged dispute, and that the alleged injury suffered is particularized as to him. See, *e. g., Lujan, supra,* at 560–561, and n. 1 (to have standing, the plaintiff must have suffered a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way"); *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 543–544 (1986) (school board member who "has no personal stake in the outcome of the litigation" has no standing); *Simon, supra,* at 39 ("The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement").

We have also stressed that the alleged injury must be legally and judicially cognizable. This requires, among other things, that the plaintiff have suffered "an invasion of a legally protected interest which is . . . concrete and particularized," *Lujan, supra,* at 560, and that the dispute is "traditionally thought to be capable of resolution through the judicial process," *Flast* v. *Cohen,* 392 U. S. 83, 97 (1968). See also *Allen,* 468 U. S., at 752 ("Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?").

We have always insisted on strict compliance with this jurisdictional standing requirement. See, *e. g., ibid.* (under Article III, "federal courts may exercise power only 'in the last resort, and as a necessity'") (quoting *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339, 345 (1892)); *Muskrat* v. *United States,* 219 U. S. 346, 356 (1911) ("[F]rom its earliest history this [C]ourt has consistently declined to exercise any powers other than those which are strictly judicial in their nature"). And our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one

of the other two branches of the Federal Government was unconstitutional. See, *e. g., Bender, supra,* at 542; *Valley Forge, supra,* at 473–474. As we said in *Allen, supra,* at 752, "the law of Art. III standing is built on a single basic idea—the idea of separation of powers." In the light of this overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere,[3] we must put aside the natural urge to proceed directly to the merits of this important dispute and to "settle" it for the sake of convenience and efficiency. Instead, we must carefully inquire as to whether appellees have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable.

## III

We have never had occasion to rule on the question of legislative standing presented here.[4] In *Powell* v. *McCormack,* 395 U. S. 486, 496, 512–514 (1969), we held that a Member of

---

[3] It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing. *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 100 (1979). We acknowledge, though, that Congress' decision to grant a particular plaintiff the right to challenge an Act's constitutionality (as here, see § 692(a)(1), *supra,* at 815–816) eliminates any prudential standing limitations and significantly lessens the risk of unwanted conflict with the Legislative Branch when that plaintiff brings suit. See, *e. g., Bennett* v. *Spear,* 520 U. S. 154, 164–166 (1997).

[4] Over strong dissent, the Court of Appeals for the District of Columbia Circuit has held that Members of Congress may have standing when (as here) they assert injury to their institutional power as legislators. See, *e. g., Kennedy* v. *Sampson,* 511 F. 2d 430, 435–436 (CADC 1974); *Moore* v. *United States House of Representatives,* 733 F. 2d 946, 951 (CADC 1984); *id.,* at 956 (Scalia, J., concurring in result); *Barnes* v. *Kline,* 759 F. 2d 21, 28–29 (CADC 1985); *id.,* at 41 (Bork, J., dissenting). But see *Holtzman* v. *Schlesinger,* 484 F. 2d 1307, 1315 (CA2 1973) (Member of Congress has no standing to challenge constitutionality of American military operations in Vietnam war); *Harrington* v. *Schlesinger,* 528 F. 2d 455, 459 (CA4 1975) (same).

Congress' constitutional challenge to his exclusion from the House of Representatives (and his consequent loss of salary) presented an Article III case or controversy. But *Powell* does not help appellees. First, appellees have not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies. Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally. See n. 7, *infra*. Second, appellees do not claim that they have been deprived of something to which they *personally* are entitled—such as their seats as Members of Congress after their constituents had elected *them*. Rather, appellees' claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete. Unlike the injury claimed by Congressman Adam Clayton Powell, the injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress. See Complaint ¶ 14 (purporting to sue "in their official capacities"). If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power. See The Federalist No. 62, p. 378 (J. Madison) (C. Rossiter ed. 1961) ("It is a misfortune incident to republican government, though in a less degree than to other governments, that those who administer it may forget their obligations to their constituents and prove unfaithful to their important trust").

The one case in which we have upheld standing for legislators (albeit *state* legislators) claiming an institutional injury is *Coleman* v. *Miller,* 307 U. S. 433 (1939). Appellees, relying heavily on this case, claim that they, like the state legislators in *Coleman,* "have a plain, direct and adequate interest

in maintaining the effectiveness of their votes," *id.*, at 438, sufficient to establish standing. In *Coleman*, 20 of Kansas' 40 State Senators voted not to ratify the proposed "Child Labor Amendment" to the Federal Constitution. With the vote deadlocked 20 to 20, the amendment ordinarily would not have been ratified. However, the State's Lieutenant Governor, the presiding officer of the State Senate, cast a deciding vote in favor of the amendment, and it was deemed ratified (after the State House of Representatives voted to ratify it). The 20 State Senators who had voted against the amendment, joined by a 21st State Senator and three State House Members, filed an action in the Kansas Supreme Court seeking a writ of mandamus that would compel the appropriate state officials to recognize that the legislature had not in fact ratified the amendment. That court held that the members of the legislature had standing to bring their mandamus action, but ruled against them on the merits. See *id.*, at 436–437.

This Court affirmed. By a vote of 5–4, we held that the members of the legislature had standing.[5] In explaining our holding, we repeatedly emphasized that if these legislators (who were suing as a bloc) were correct on the merits, then their votes not to ratify the amendment were deprived of all validity:

> "Here, the plaintiffs include twenty senators, whose votes against ratification have been *overridden* and *vir-*

---

[5] Chief Justice Hughes wrote an opinion styled "the opinion of the Court." *Coleman*, 307 U. S., at 435. Four Justices concurred in the judgment, partially on the ground that the legislators lacked standing. See *id.*, at 456–457 (opinion of Black, J., joined by Roberts, Frankfurter, and Douglas, JJ.); *id.*, at 460 (opinion of Frankfurter, J., joined by Roberts, Black, and Douglas, JJ.). Two Justices dissented on the merits. See *id.*, at 470 (opinion of Butler, J., joined by McReynolds, J.). Thus, even though there were only two Justices who joined Chief Justice Hughes' opinion on the merits, it is apparent that the two dissenting Justices joined his opinion as to the standing discussion. Otherwise, Justice Frankfurter's opinion denying standing would have been the controlling opinion.

*tually held for naught* although if they are right in their contentions *their votes would have been sufficient to defeat ratification.* We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.,* at 438 (emphasis added).

"[T]he twenty senators were not only qualified to vote on the question of ratification but *their votes,* if the Lieutenant Governor were excluded as not being a part of the legislature for that purpose, *would have been decisive in defeating the ratifying resolution." Id.,* at 441 (emphasis added).

"[W]e find no departure from principle in recognizing in the instant case that *at least the twenty senators whose votes,* if their contention were sustained, *would have been sufficient to defeat the resolution* ratifying the proposed constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision." *Id.,* at 446 (emphasis added).

It is obvious, then, that our holding in *Coleman* stands (at most, see n. 8, *infra*) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.[6]

---

[6] See also *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 544–545, n. 7 (1986) (in dicta, suggesting hypothetically that if state law authorized a school board to take action only by unanimous consent, if a school board member voted against a particular action, and if the board nonetheless took the action, the board member "might claim that he was legally entitled to protect 'the effectiveness of [his] vot[e],' *Coleman*[, 307 U. S., at 438,] . . . [b]ut in that event [he] would have to allege that his vote was diluted or rendered nugatory under state law").

It should be equally obvious that appellees' claim does not fall within our holding in *Coleman*, as thus understood. They have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. In the vote on the Act, their votes were given full effect. They simply lost that vote.[7] Nor can they allege that the Act will nullify their votes in the future in the same way that the votes of the *Coleman* legislators had been nullified. In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process. In addition, a majority of Senators and Congressmen can vote to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act; again, the Act has no effect on this process. *Coleman* thus provides little meaningful precedent for appellees' argument.[8]

---

[7] Just as appellees cannot show that their vote was denied or nullified as in *Coleman* (in the sense that a bill they voted for would have become law if their vote had not been stripped of its validity), so are they unable to show that their vote was denied or nullified in a discriminatory manner (in the sense that their vote was denied its full validity in relation to the votes of their colleagues). Thus, the various hypotheticals offered by appellees in their briefs and discussed during oral argument have no applicability to this case. See Reply Brief for Appellees 6 (positing hypothetical law in which "first-term Members were not allowed to vote on appropriations bills," or in which "*every* Member was disqualified on grounds of partiality from voting on major federal projects in his or her own district"); Tr. of Oral Arg. 17 ("QUESTION: But [Congress] might have passed a statute that said the Senators from Iowa on hog-farming matters should have only a half-a-vote. Would they have standing to challenge that?").

[8] Since we hold that *Coleman* may be distinguished from the instant case on this ground, we need not decide whether *Coleman* may also be distinguished in other ways. For instance, appellants have argued that *Coleman* has no applicability to a similar suit brought in federal court, since that decision depended on the fact that the Kansas Supreme Court "treated" the senators' interest in their votes "as a basis for entertaining and deciding the federal questions." 307 U. S., at 446. They have also

Nevertheless, appellees rely heavily on our statement in *Coleman* that the Kansas senators had "a plain, direct and adequate interest in maintaining the effectiveness of their votes." Appellees claim that this statement applies to them because their votes on future appropriations bills (assuming a majority of Congress does not decide to exempt those bills from the Act) will be less "effective" than before, and that the "meaning" and "integrity" of their vote has changed. Brief for Appellees 24, 28. The argument goes as follows. Before the Act, Members of Congress could be sure that when they voted for, and Congress passed, an appropriations bill that included funds for Project X, one of two things would happen: (i) the bill would become law and all of the projects listed in the bill would go into effect, or (ii) the bill would not become law and none of the projects listed in the bill would go into effect. Either way, a vote for the appropriations bill meant a vote for a package of projects that were inextricably linked. After the Act, however, a vote for an appropriations bill that includes Project X means something different. Now, in addition to the two possibilities listed above, there is a third option: The bill will become law and then the President will "cancel" Project X.[9]

Even taking appellees at their word about the change in the "meaning" and "effectiveness" of their vote for appropriations bills which are subject to the Act, we think their argument pulls *Coleman* too far from its moorings. Appellees'

---

argued that *Coleman* has no applicability to a similar suit brought by federal legislators, since the separation-of-powers concerns present in such a suit were not present in *Coleman,* and since any federalism concerns were eliminated by the Kansas Supreme Court's decision to take jurisdiction over the case.

[9] Although Congress could reinstate Project X through a "disapproval bill," it would assumedly take two-thirds of both Houses to do so, since the President could be expected to veto the Project X "disapproval bill." But see Robinson, Public Choice Speculations on the Item Veto, 74 Va. L. Rev. 403, 411–412 (1988) (political costs that President would suffer in important congressional districts might limit use of line-item veto).

use of the word "effectiveness" to link their argument to *Coleman* stretches the word far beyond the sense in which the *Coleman* opinion used it. There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here. To uphold standing here would require a drastic extension of *Coleman*. We are unwilling to take that step.

Not only do appellees lack support from precedent, but historical practice appears to cut against them as well. It is evident from several episodes in our history that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power. The Tenure of Office Act, passed by Congress over the veto of President Andrew Johnson in 1867, was a thorn in the side of succeeding Presidents until it was finally repealed at the behest of President Grover Cleveland in 1887. See generally W. Rehnquist, Grand Inquests: The Historic Impeachments of Justice Samuel Chase and President Andrew Johnson 210–235, 260–268 (1992). It provided that an official whose appointment to an Executive Branch office required confirmation by the Senate could not be removed without the consent of the Senate. 14 Stat. 430, ch. 154. In 1868, Johnson removed his Secretary of War, Edwin M. Stanton. Within a week, the House of Representatives impeached Johnson. 1 Trial of Andrew Johnson, President of the United States, Before the Senate of the United States on Impeachment by the House of Representatives for High Crimes and Misdemeanors 4 (1868). One of the principal charges against him was that his removal of Stanton violated the Tenure of Office Act. *Id.*, at 6–8. At the conclusion of his trial before the Senate, Johnson was acquitted by one vote. 2 *id.*, at 487, 496–498. Surely Johnson had a stronger claim of diminution of his official power as a result of the Tenure of Office Act than do the appellees in the present case. Indeed, if their

claim were sustained, it would appear that President John-
son would have had standing to challenge the Tenure of Of-
fice Act before he ever thought about firing a cabinet mem-
ber, simply on the grounds that it altered the calculus by
which he would nominate someone to his cabinet. Yet if the
federal courts had entertained an action to adjudicate the
constitutionality of the Tenure of Office Act immediately
after its passage in 1867, they would have been improperly
and unnecessarily plunged into the bitter political battle
being waged between the President and Congress.

Succeeding Presidents—Ulysses S. Grant and Grover
Cleveland—urged Congress to repeal the Tenure of Office
Act, and Cleveland's plea was finally heeded in 1887. 24
Stat. 500, ch. 353. It occurred to neither of these Presidents
that they might challenge the Act in an Article III court.
Eventually, in a suit brought by a plaintiff with traditional
Article III standing, this Court did have the opportunity to
pass on the constitutionality of the provision contained in the
Tenure of Office Act. A sort of mini-Tenure of Office Act
covering only the Post Office Department had been enacted
in 1872, 17 Stat. 284, ch. 335, § 2, and it remained on the
books after the Tenure of Office Act's repeal in 1887. In
the last days of the Woodrow Wilson administration, Albert
Burleson, Wilson's Postmaster General, came to believe that
Frank Myers, the Postmaster in Portland, Oregon, had com-
mitted fraud in the course of his official duties. When
Myers refused to resign, Burleson, acting at the direction of
the President, removed him. Myers sued in the Court of
Claims to recover lost salary. In *Myers* v. *United States*,
272 U. S. 52 (1926), more than half a century after Johnson's
impeachment, this Court held that Congress could not re-
quire senatorial consent to the removal of a Postmaster who
had been appointed by the President with the consent of the
Senate. *Id.*, at 106–107, 173, 176. In the course of its opin-
ion, the Court expressed the view that the original Tenure
of Office Act was unconstitutional. *Id.*, at 176. See also *id.*,

at 173 ("This Court has, since the Tenure of Office Act, manifested an earnest desire to avoid a final settlement of the question until it should be inevitably presented, as it is here").

If the appellees in the present case have standing, presumably President Wilson, or Presidents Grant and Cleveland before him, would likewise have had standing, and could have challenged the law preventing the removal of a Presidential appointee without the consent of Congress. Similarly, in *INS* v. *Chadha*, 462 U. S. 919 (1983), the Attorney General would have had standing to challenge the one-House veto provision because it rendered his authority provisional rather than final. By parity of reasoning, President Gerald Ford could have sued to challenge the appointment provisions of the Federal Election Campaign Act which were struck down in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, and a Member of Congress could have challenged the validity of President Coolidge's pocket veto that was sustained in *The Pocket Veto Case*, 279 U. S. 655 (1929).

There would be nothing irrational about a system that granted standing in these cases; some European constitutional courts operate under one or another variant of such a regime. See, *e. g.*, Favoreu, Constitutional Review in Europe, in Constitutionalism and Rights 38, 41 (L. Henkin & A. Rosenthal eds. 1990); Wright Sheive, Central and Eastern European Constitutional Courts and the Antimajoritarian Objection to Judicial Review, 26 Law & Pol'y Int'l Bus. 1201, 1209 (1995); A. Stone, The Birth of Judicial Politics in France 232 (1992); D. Kommers, Judicial Politics in West Germany: A Study of the Federal Constitutional Court 106 (1976). But it is obviously not the regime that has obtained under our Constitution to date. Our regime contemplates a more restricted role for Article III courts, well expressed by Justice Powell in his concurring opinion in *United States* v. *Richardson*, 418 U. S. 166 (1974):

"The irreplaceable value of the power articulated by Mr. Chief Justice Marshall [in *Marbury* v. *Madison,* 1 Cranch 137 (1803),] lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action. It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests." *Id.,* at 192.

## IV

In sum, appellees have alleged no injury to themselves as individuals (contra, *Powell*), the institutional injury they allege is wholly abstract and widely dispersed (contra, *Coleman*), and their attempt to litigate this dispute at this time and in this form is contrary to historical experience. We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit.[10] See n. 2, *supra.* We also note that our conclusion neither deprives Members of Congress of an adequate remedy (since they may repeal the Act or exempt appropriations bills from its reach), nor forecloses the Act from constitutional challenge (by someone who suffers judicially cognizable injury as a result of the Act). Whether the case would

---

[10] Cf. *Bender,* 475 U. S., at 544 ("Generally speaking, members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take"); *United States* v. *Ballin,* 144 U. S. 1, 7 (1892) ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole").

be different if any of these circumstances were different we need not now decide.

We therefore hold that these individual members of Congress do not have a sufficient "personal stake" in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing.[11]   The judgment of the District Court is vacated, and the case is remanded with instructions to dismiss the complaint for lack of jurisdiction.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring in the judgment.

Appellees claim that the Line Item Veto Act, Pub. L. 104–130, 110 Stat. 1200, codified at 2 U. S. C. § 691 *et seq.* (1994 ed., Supp. II), is unconstitutional because it grants the President power, which Article I vests in Congress, to repeal a provision of federal law.   As JUSTICE STEVENS points out, appellees essentially claim that, by granting the President power to repeal statutes, the Act injures them by depriving them of their official role in voting on the provisions that become law.   See *post,* at 836–837.   Under our precedents, it is fairly debatable whether this injury is sufficiently "personal" and "concrete" to satisfy the requirements of Article III.[1]

There is, first, difficulty in applying the rule that an injury on which standing is predicated be personal, not official.   If

---

[11] In addition, it is far from clear that this injury is "fairly traceable" to appellants, as our precedents require, since the alleged cause of appellees' injury is not appellants' exercise of legislative power but the actions of their own colleagues in Congress in passing the Act.   Cf. *Holtzman* v. *Schlesinger,* 484 F. 2d 1307, 1315 (CA2 1973) ("Representative Holtzman . . . has not been denied any right to vote on [the war in Cambodia] by any action of the defendants [Executive Branch officials]. . . . The fact that her vote was ineffective was due to the contrary votes of her colleagues and not the defendants herein").

[1] While Congress may, by authorizing suit for particular parties, remove any prudential standing barriers, as it has in this case, see *ante,* at 820, n. 3, it may not reduce the Article III minimums.

our standing doctrine recognized this as a distinction with a dispositive effect, the injury claimed would not qualify: the Court is certainly right in concluding that appellees sue not in personal capacities, but as holders of seats in the Congress. See *ante*, at 821. And yet the significance of this distinction is not so straightforward. In *Braxton County Court* v. *West Virginia ex rel. State Tax Comm'rs*, 208 U. S. 192 (1908), it is true, we dismissed a challenge by a county court to a state tax law for lack of jurisdiction, broadly stating that " 'the interest of a [party seeking relief] in this court should be a personal and not an official interest,' " *id.*, at 198 (quoting *Smith* v. *Indiana*, 191 U. S. 138, 149 (1903)); accord, *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 151 (1951) (Frankfurter, J., concurring). But the Court found *Braxton County* "inapplicable" to a challenge by a group of state legislators in *Coleman* v. *Miller*, 307 U. S. 433, 438, and n. 3 (1939), and found the legislators had standing even though they claimed no injury but a deprivation of official voting power, *id.*, at 437–446.[2] Thus, it is at least arguable that the official nature of the harm here does not preclude standing.

Nor is appellees' injury so general that, under our case law, they clearly cannot satisfy the requirement of concreteness. On the one hand, appellees are not simply claiming

---

[2] As appellants note, it is also possible that the impairment of certain official powers may support standing for Congress, or one House thereof, to seek the aid of the Federal Judiciary. See Brief for Appellants 26, n. 14 (citing *McGrain* v. *Daugherty*, 273 U. S. 135, 174 (1927)). And, as appellants concede, see Brief for Appellants 20–21, 25–28, an injury to official authority may support standing for a government itself or its duly authorized agents, see, *e. g.*, *Diamond* v. *Charles*, 476 U. S. 54, 62 (1986) (noting that "a State has standing to defend the constitutionality of its statute" in federal court); *ICC* v. *Oregon-Washington R. & Nav. Co.*, 288 U. S. 14, 25–27 (1933) (explaining that a federal agency had standing to appeal, because an official or an agency could be designated to defend the interests of the Federal Government in federal court); *Coleman* v. *Miller*, 307 U. S. 433, 441–445 (1939) (discussing cases).

harm to their interest in having government abide by the Constitution, which would be shared to the same extent by the public at large and thus provide no basis for suit, see, e. g., *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 482–483 (1982); *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 217, 220 (1974); *Fairchild* v. *Hughes*, 258 U. S. 126, 129–130 (1922). Instead, appellees allege that the Act deprives them of an element of their legislative power; as a factual matter they have a more direct and tangible interest in the preservation of that power than the general citizenry has. Cf. *Coleman, supra*, at 438 (concluding that state legislators had a "plain" and "direct" interest in the effectiveness of their votes); see also *Hendrick* v. *Walters*, 865 P. 2d 1232, 1236–1238 (Okla. 1993) (concluding that a legislator had a personal interest in a suit to determine whether the Governor had lawfully assumed office due to substantial interaction between the Governor and legislature); *Colorado General Assembly* v. *Lamm*, 704 P. 2d 1371, 1376–1378 (Colo. 1985) (concluding that the legislature had suffered an injury in fact as a result of the Governor's exercise of his line item veto power). On the other hand, the alleged, continuing deprivation of federal legislative power is not as specific or limited as the nullification of the decisive votes of a group of legislators in connection with a specific item of legislative consideration in *Coleman*, being instead shared by all the members of the official class who could suffer that injury, the Members of Congress.[3]

Because it is fairly debatable whether appellees' injury is sufficiently personal and concrete to give them standing, it behooves us to resolve the question under more general

---

[3] As the Court explains, *Coleman* may well be distinguishable on the further ground that it involved a suit by state legislators that did not implicate either the separation-of-powers concerns raised in this case or corresponding federalism concerns (since the Kansas Supreme Court had exercised jurisdiction to decide a federal issue). See *ante*, at 824–825, n. 8.

separation-of-powers principles underlying our standing requirements. See *Allen* v. *Wright,* 468 U. S. 737, 752 (1984); *United States* v. *Richardson,* 418 U. S. 166, 188–197 (1974) (Powell, J., concurring). While "our constitutional structure [does not] requir[e] . . . that the Judicial Branch shrink from a confrontation with the other two coequal branches," *Valley Forge Christian College,* 454 U. S., at 474, we have cautioned that respect for the separation of powers requires the Judicial Branch to exercise restraint in deciding constitutional issues by resolving those implicating the powers of the three branches of Government as a "last resort," see *ibid.* The counsel of restraint in this case begins with the fact that a dispute involving only officials, and the official interests of those, who serve in the branches of the National Government lies far from the model of the traditional common-law cause of action at the conceptual core of the case-or-controversy requirement, see *Joint Anti-Fascist Refugee Comm., supra,* at 150, 152 (Frankfurter, J., concurring). Although the contest here is not formally between the political branches (since Congress passed the bill augmenting Presidential power and the President signed it), it is in substance an interbranch controversy about calibrating the legislative and executive powers, as well as an intrabranch dispute between segments of Congress itself. Intervention in such a controversy would risk damaging the public confidence that is vital to the functioning of the Judicial Branch, cf. *Valley Forge Christian College, supra,* at 474 (quoting *Richardson, supra,* at 188 (Powell, J., concurring)), by embroiling the federal courts in a power contest nearly at the height of its political tension.

While it is true that a suit challenging the constitutionality of this Act brought by a party from outside the Federal Government would also involve the Court in resolving the dispute over the allocation of power between the political branches, it would expose the Judicial Branch to a lesser risk. Deciding a suit to vindicate an interest outside the

Government raises no specter of judicial readiness to enlist on one side of a political tug-of-war, since "the propriety of such action by a federal court has been recognized since *Marbury* v. *Madison*, 1 Cranch 137 (1803)." *Valley Forge Christian College, supra*, at 473–474. And just as the presence of a party beyond the Government places the Judiciary at some remove from the political forces, the need to await injury to such a plaintiff allows the courts some greater separation in the time between the political resolution and the judicial review.

> "[B]y connecting the censureship of the laws with the private interests of members of the community, . . . the legislation is protected from wanton assailants, and from the daily aggressions of party-spirit." 1 A. de Tocqueville, Democracy in America 105 (Schoken ed. 1961).

The virtue of waiting for a private suit is only confirmed by the certainty that another suit can come to us. The parties agree, and I see no reason to question, that if the President "cancels" a conventional spending or tax provision pursuant to the Act, the putative beneficiaries of that provision will likely suffer a cognizable injury and thereby have standing under Article III. See Brief for Appellants 19–20, and n. 10; Brief for Appellees 32–33. By depriving beneficiaries of the money to which they would otherwise be entitled, a cancellation would produce an injury that is "actual," "personal and individual," and involve harm to a "legally protected interest," *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560, and n. 1 (1992) (internal quotation marks omitted); assuming the canceled provision would not apply equally to the entire public, the injury would be "concrete," *id.*, at 560, 573–574; and it would be "fairly trace[able] to the challenged action of the" executive officials involved in the cancellation, *id.*, at 560 (internal quotation marks omitted), as well as probably "redress[able] by a favorable decision," *id.*, at 561 (internal quotation marks and citation omitted). See, *e. g.*,

*Train* v. *City of New York*, 420 U. S. 35, 40 (1975) (suit by City of New York seeking proper allotment of federal funds). While the Court has declined to lower standing requirements simply because no one would otherwise be able to litigate a claim, see *Valley Forge Christian College, supra,* at 489; *Schlesinger,* 418 U. S., at 227; *United States* v. *Richardson, supra,* at 179, the certainty of a plaintiff who obviously would have standing to bring a suit to court after the politics had at least subsided from a full boil is a good reason to resolve doubts about standing against the plaintiff invoking an official interest, cf. *Joint Anti-Fascist Refugee Comm.,* 341 U. S., at 153–154 (Frankfurter, J., concurring) (explaining that the availability of another person to bring suit may affect the standing calculus).

I therefore conclude that appellees' alleged injuries are insufficiently personal and concrete to satisfy Article III standing requirements of personal and concrete harm. Since this would be so in any suit under the conditions here, I accordingly find no cognizable injury to appellees.

JUSTICE STEVENS, dissenting.

The Line Item Veto Act purports to establish a procedure for the creation of laws that are truncated versions of bills that have been passed by the Congress and presented to the President for signature. If the procedure is valid, it will deny every Senator and every Representative any opportunity to vote for or against the truncated measure that survives the exercise of the President's cancellation authority. Because the opportunity to cast such votes is a right guaranteed by the text of the Constitution, I think it clear that the persons who are deprived of that right by the Act have standing to challenge its constitutionality. Moreover, because the impairment of that constitutional right has an immediate impact on their official powers, in my judgment they need not wait until after the President has exercised his cancellation authority to bring suit. Finally, the same reason

that the appellees have standing provides a sufficient basis for concluding that the statute is unconstitutional.

Article I, § 7, of the Constitution provides that every Senator and every Representative has the power to vote on "Every Bill . . . before it become a law" either as a result of its having been signed by the President or as a result of its "Reconsideration" in the light of the President's "Objections."[1]   In contrast, the Line Item Veto Act establishes a mechanism by which bills passed by both Houses of Congress will eventually produce laws that have not passed either House of Congress and that have not been voted on by any Senator or Representative.

Assuming for the moment that this procedure is constitutionally permissible, and that the President will from time to time exercise the power to cancel portions of a just-enacted law, it follows that the statute deprives every Senator and every Representative of the right to vote for or against measures that may become law.   The appellees cast their challenge to the constitutionality of the Act in a slightly different way.   Their complaint asserted that the Act "alter[s] the legal and practical effect of all votes they may cast

---

[1] The full text of the relevant paragraph of § 7 provides:

"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it.   If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.   But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively.   If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."   U. S. Const., Art. I, § 7.

on bills containing such separately vetoable items" and "divest[s] the[m] of their constitutional role in the repeal of legislation." Complaint ¶ 14. These two claimed injuries are at base the same as the injury on which I rest my analysis. The reason the complaint frames the issues in the way that it does is related to the Act's technical operation. Under the Act, the President would receive and sign a bill exactly as it passed both Houses, and would exercise his partial veto power only *after* the law had been enacted. See 2 U. S. C. § 691(a) (1994 ed., Supp. II). The appellees thus articulated their claim as a combination of the diminished effect of their initial vote and the circumvention of their right to participate in the subsequent repeal. Whether one looks at the claim from this perspective, or as a simple denial of their right to vote on the precise text that will ultimately become law, the basic nature of the injury caused by the Act is the same.

In my judgment, the deprivation of this right—essential to the legislator's office—constitutes a sufficient injury to provide every Member of Congress with standing to challenge the constitutionality of the statute. If the dilution of an individual voter's power to elect representatives provides that voter with standing—as it surely does, see, *e. g., Baker* v. *Carr,* 369 U. S. 186, 204–208 (1962)—the deprivation of the right possessed by each Senator and Representative to vote for or against the precise text of any bill before it becomes law must also be a sufficient injury to create Article III standing for them.[2] Although, as JUSTICE BREYER demonstrates, see *post,* at 840–843 (dissenting opinion), the majority's attempt to distinguish *Coleman* v. *Miller,* 307 U. S. 433, 438 (1939), is not persuasive, I need not rely on that case to

---

[2] The appellees' assertion of their right to vote on legislation is not simply a generalized interest in the proper administration of government, cf. *Allen* v. *Wright,* 468 U. S. 737, 754 (1984), and the legislators' personal interest in the ability to exercise their constitutionally ensured power to vote on laws is certainly distinct from the interest that an individual citizen challenging the Act might assert.

support my view that the Members of Congress have standing to sue in this instance. In *Coleman,* the legislators complained that their votes were denied full effectiveness. See *ibid.;* see also *Dyer* v. *Blair,* 390 F. Supp. 1291, 1297, n. 12 (ND Ill. 1975). But the law at issue here does not simply alter the effect of the legislators' votes; it denies them any opportunity at all to cast votes for or against the truncated versions of the bills presented to the President.[3]

Moreover, the appellees convincingly explain how the immediate, constant threat of the partial veto power has a palpable effect on their current legislative choices. See Brief for Appellees 23–25, 29–31. Because the Act has this immediate and important impact on the powers of Members of Congress, and on the manner in which they undertake their legislative responsibilities, they need not await an exercise of the President's cancellation authority to institute the litigation that the statute itself authorizes. See 2 U. S. C. § 692(a)(1) (1994 ed., Supp. II).

Given the fact that the authority at stake is granted by the plain and unambiguous text of Article I, it is equally clear to me that the statutory attempt to eliminate it is invalid.

Accordingly, I would affirm the judgment of the District Court.

JUSTICE BREYER, dissenting.

As the majority points out, Congress has enacted a specific statute (signed by the President) granting the plaintiffs authority to bring this case. *Ante,* at 815–816, citing 2 U. S. C.

---

[3] The majority's reference to the absence of any similar suit in earlier disputes between Congress and the President, see *ante,* at 826–828, does not strike me as particularly relevant. First, the fact that others did not choose to bring suit does not necessarily mean the Constitution would have precluded them from doing so. Second, because Congress did not authorize declaratory judgment actions until the federal Declaratory Judgment Act of 1934, 48 Stat. 955, the fact that President Johnson did not bring such an action in 1868 is not entirely surprising.

§ 692(a)(1) (1994 ed., Supp. II). That statutory authorization "eliminates any prudential standing limitations and significantly lessens the risk of unwanted conflict with the Legislative Branch." *Ante,* at 820, n. 3. Congress, however, cannot grant the federal courts more power than the Constitution itself authorizes us to exercise. Cf. *Hayburn's Case,* 2 Dall. 409 (1792). Thus, we can proceed to the merits only if the "judicial Power" of the United States—"extend[ing] to . . . Cases, in Law and Equity" and to "Controversies"—covers the dispute before us. U. S. Const., Art. III, § 2.

I concede that there would be no case or controversy here were the dispute before us not truly adversary, or were it not concrete and focused. But the interests that the parties assert are genuine and opposing, and the parties are therefore truly adverse. Cf. *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339 (1892). Moreover, as JUSTICE STEVENS points out, the harm that the plaintiffs suffer (on their view of the law) consists in part of the systematic abandonment of laws for which a majority voted, in part of the creation of other laws in violation of procedural rights which (they say) the Constitution provides them, and in part of the consequent and immediate impediment to their ability to do the job that the Constitution requires them to do. See *ante,* at 835–837, 838 (dissenting opinion); Complaint ¶ 14; App. 34–36, 39–40, 42–46, 54–55, 57–59, 62–64. Since federal courts might well adjudicate cases involving comparable harms in other contexts (such as purely private contexts), the harm at issue is sufficiently concrete. Cf., *e. g., Bennett* v. *Spear,* 520 U. S. 154, 167–174 (1997); *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville,* 508 U. S. 656 (1993). See also *ante,* at 831–832 (SOUTER, J., concurring in judgment). The harm is focused and the accompanying legal issues are both focused and of the sort that this Court is used to deciding. See, *e. g., United States* v. *Munoz-Flores,* 495 U. S. 385, 392–396 (1990). The plaintiffs

therefore do not ask the Court "to pass upon" an "abstract, intellectual proble[m]," but to determine "a concrete, living contest between" genuine "adversaries." *Coleman* v. *Miller*, 307 U. S. 433, 460 (1939) (Frankfurter, J., dissenting).

Nonetheless, there remains a serious constitutional difficulty due to the fact that this dispute about lawmaking procedures arises between Government officials and is brought by legislators. The critical question is whether or not this dispute, for that reason, is so different in form from those "matters that were the traditional concern of the courts at Westminster" that it falls outside the scope of Article III's judicial power. *Ibid.* Justice Frankfurter explained this argument in his dissent in *Coleman*, saying that courts traditionally

> "leave intra-parliamentary controversies to parliaments and outside the scrutiny of law courts. The procedures for voting in legislative assemblies—who are members, how and when they should vote, what is the requisite number of votes for different phases of legislative activity, what votes were cast and how they were counted— surely are matters that not merely concern political action, but are of the very essence of political action, if 'political' has any connotation at all. . . . In no sense are they matters of 'private damage.' They pertain to legislators not as individuals but as political representatives executing the legislative process. To open the law courts to such controversies is to have courts sit in judgment on the manifold disputes engendered by procedures for voting in legislative assemblies." *Id.,* at 469–470.

Justice Frankfurter dissented because, in his view, the "political" nature of the case, which involved legislators, placed the dispute outside the scope of Article III's "case" or "controversy" requirement. Nonetheless, the *Coleman* court rejected his argument.

Although the majority today attempts to distinguish *Coleman, ante,* at 821–826, I do not believe that Justice Frankfurter's argument or variations on its theme can carry the day here. First, as previously mentioned, the jurisdictional statute before us eliminates all but constitutional considerations, and the circumstances mentioned above remove all but the "political" or "intragovernmental" aspect of the constitutional issue. *Supra,* at 838–839.

Second, the Constitution does not draw an absolute line between disputes involving a "personal" harm and those involving an "official" harm." Cf. *ante,* at 818, 821. See *ante,* at 831, n. 2 (SOUTER, J., concurring in judgment). Justice Frankfurter himself said that this Court had heard cases involving injuries suffered by state officials in their official capacities. *Coleman, supra,* at 466 (citing *Blodgett* v. *Silberman,* 277 U. S. 1 (1928), and *Boynton* v. *Hutchinson,* 291 U. S. 656, cert. dism'd on other grounds, 292 U. S. 601 (1934)). See also, *e. g., Will* v. *Calvert Fire Ins. Co.,* 437 U. S. 655, 661 (1978) (Federal District Judge appealing mandamus issued against him in respect to a docketkeeping matter); *Board of Ed. of Central School Dist. No. 1* v. *Allen,* 392 U. S. 236, 241, n. 5 (1968) (indicating that school board has standing where members must either violate oath or risk loss of school funds and expulsion from office). *Coleman* itself involved injuries in the plaintiff legislators' official capacity. And the majority in this case, suggesting that legislators might have standing to complain of rules that "denied" them "their vote . . . in a discriminatory manner," concedes at least the possibility that any constitutional rule distinguishing "official" from "personal" injury is not absolute. *Ante,* at 824, n. 7. See also *ante,* at 821.

Third, Justice Frankfurter's views were dissenting views, and the dispute before us, when compared to *Coleman,* presents a much stronger claim, not a weaker claim, for constitutional justiciability. The lawmakers in *Coleman* complained of a lawmaking procedure that, at worst, improperly counted

Kansas as having ratified one proposed constitutional amendment, which had been ratified by only 5 other States, and rejected by 26, making it unlikely that it would ever become law. *Coleman, supra,* at 436. The lawmakers in this case complain of a lawmaking procedure that threatens the validity of many laws (for example, all appropriations laws) that Congress regularly and frequently enacts. The systematic nature of the harm immediately affects the legislators' ability to do their jobs. The harms here are more serious, more pervasive, and more immediate than the harm at issue in *Coleman.* Cf. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 471 (1982), quoting *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S., at 345 (judicial power " 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy' ").

The majority finds a difference in the fact that the validity of the legislators' votes was directly at issue in *Coleman.*

> "[O]ur holding in *Coleman* stands . . . for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Ante,* at 823.

But since many of the present plaintiffs will likely vote in the majority for at least some appropriations bills that are then subject to Presidential cancellation, I think that—on their view of the law—their votes are threatened with nullification too. Cf. *ante,* at 823, n. 6, 825.

The majority also suggests various distinctions arising out of the fact that *Coleman* involved a state legislature, rather than the federal Congress. *Ante,* at 824–825, n. 8. See also *ante,* at 832, n. 3 (SOUTER, J., concurring in judgment). But Justice Frankfurter treated comparable arguments as irrelevant, and the *Coleman* majority did not disagree. *Coleman,*

307 U. S., at 462, 465–466, and n. 6 (Frankfurter, J., dissenting); *id.*, at 446.  While I recognize the existence of potential differences between state and federal legislators, I do not believe that those differences would be determinative here, where constitutional, not prudential, considerations are at issue, particularly given the Constitution's somewhat comparable concerns for state authority and the presence here of a federal statute (signed by the President) specifically authorizing this lawsuit.  Cf. *ante*, at 833 (SOUTER, J., concurring in judgment).  And in light of the immediacy of the harm, I do not think that the possibility of a later challenge by a private plaintiff, see *ante*, at 834–835 (SOUTER, J., concurring in judgment), could be constitutionally determinative.  Finally, I do not believe that the majority's historical examples primarily involving the Executive Branch and involving lawsuits that were *not* brought, *ante*, at 826–828, are legally determinative.  See *ante*, at 838, n. 3 (STEVENS, J., dissenting).

In sum, I do not believe that the Court can find this case nonjusticiable without overruling *Coleman.*  Since it does not do so, I need not decide whether the systematic nature, seriousness, and immediacy of the harm would make this dispute constitutionally justiciable even in *Coleman*'s absence.  Rather, I can and would find this case justiciable on *Coleman*'s authority.  I add that because the majority has decided that this dispute is not now justiciable and has expressed no view on the merits of the appeal, I shall not discuss the merits either, but reserve them for future argument.