**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2315
_____


GENE YAW, Senator; LISA BAKER, Senator;
THE PENNSYLVANIA SENATE REPUBLICAN
CAUCUS, in their Official Legislative Capacities and as
Trustees of the Natural Resources of the Commonwealth of
Pennsylvania; DAMASCUS TOWNSHIP, in its Official and
as Trustee of the Natural Resources of the Commonwealth of
Pennsylvania; DYBERRY TOWNSHIP; WAYNE
COUNTY; CARBON COUNTY

v.

THE DELAWARE RIVER BASIN COMMISSION


DELAWARE RIVERKEEPER NETWORK; MAYA K.
VAN ROSSUM; SENATOR STEVEN SANTARSIERO;
SENATOR CAROLYN COMITTA; SENATOR AMANDA
CAPPELLETTI; SENATOR MARIA COLLETT;
SENATOR WAYNE FONTANA; SENATOR ART
HAYWOOD; SENATOR VINCE HUGHES; SENATOR
JOHN KANE; SENATOR TIM KEARNEY; SENATOR
KATIE MUTH; SENATOR JOHN SABATINA; SENATOR
NIKIL SAVAL; SENATOR JUDY SCHWANK; SENATOR

SHARIF STREET; SENATOR TINA TARTAGLIONE;
SENATOR ANTHONY WILLIAMS;
BUCKS COUNTY; MONTGOMERY COUNTY
(Intervenors in District Court)


Gene Yaw, Senator; Lisa Baker, Senator, The Pennsylvania
Senate Republican Caucus, In their Official Legislative Ca-
pacities and as Trustees of the natural resources of the Com-
monwealth of Pennsylvania; Damascus Township, In its Offi-
cial Capacity and as Trustee of the Natural Resources of the
Commonwealth of Pennsylvania;
Dyberry Township; Wayne County
Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:21-cv-00119)
District Judge: Paul S. Diamond

_____

Argued: March 31, 2022

Before: RESTREPO, ROTH, and FUENTES, *Circuit Judges*

(Filed: September 16, 2022)

_____


Shohin H. Vance    **[ARGUED]**
Matthew H. Haverstick
Joshua J. Voss
Samantha G. Zimmer

2

Kleinbard
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103

Jeffrey S. Treat
926 Court Street
Honesdale, PA 18431
        *Counsel for Appellants*

John S. Stapleton
LeVan Stapleton Segal Cochran
601 Route 73 North
Four Greentree Centre
Suite 303
Marlton, NJ 08053

Kenneth J. Warren **[ARGUED]**
Warren Environmental Counsel
975 Mill Road
Millridge Manor House Suite A
Bryn Mawr, PA 19010
        *Counsel for Appellee Delaware River Basin*
        *Commission*

Joseph J. Khan
Bucks County Law Department
55 East Court Street, 5th Floor
Doylestown, PA 18901
        *Counsel for Intervenor County of Bucks*

Kacy C. Manahan **[ARGUED]**
Delaware Riverkeeper Network

925 Canal Street, Suite 3701
Bristol, PA 19007

    *Counsel for Intervenors Delaware Riverkeeper
    Network and Maya K. Van Rossum*

Robert A. Wiygul **[ARGUED]**
Peter V. Keays
Steven T. Miano
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA 19103

    *Counsel for Intervenor Senator Steven Santarsiero,
    et al*

Paul J. Cohen, II
Clean Air Council
135 South 19th Street, Suite 300
Philadelphia, PA 19103

Jessica R. O'Neill
PennFuture
1429 Walnut Street, Suite 400
Philadelphia, PA 19102

    *Counsel for Amicus Curiae*

————————————

OPINION OF THE COURT

————————————

FUENTES, *Circuit Judge*.

In February 2021, the Delaware River Basin Commission banned high-volume hydraulic fracturing (commonly known as "fracking") within the Delaware River Basin. The ban reflected the Commission's determination that fracking "poses significant, immediate and long-term risks to the development, conservation, utilization, management, and preservation of the [Basin's] water resources."[1] The ban also codified what had been a "*de facto* moratorium" on natural gas extraction in the Basin since 2010.[2]

Plaintiffs-Appellants—two Pennsylvania state senators, the Pennsylvania Senate Republican Caucus, and several Pennsylvania municipalities—filed this lawsuit challenging the ban. Among other things, they allege that, in enacting the ban, the Commission exceeded its authority under the Delaware River Basin Compact, violated the Takings Clause of the United States Constitution, illegally exercised the power of eminent domain, and violated the Constitution's guarantee of a republican form of government. The District Court did not reach the merits of these claims because it found that Plaintiffs-Appellants lack standing to pursue them in federal court.

Although Plaintiffs-Appellants advance several arguments for why they have standing to challenge the ban, none of them have alleged the kinds of injuries that Article III demands. In our view, the state senators and the Senate Republican Caucus lack standing because the legislative injuries they allege affect the state legislature as a whole, and

---

[1] Joint Appendix ("JA") 0371.
[2] JA0305.

under well-established Supreme Court caselaw, "individual members lack standing to assert the institutional interests of a legislature."[3]   The municipalities lack standing because the economic injuries they allege are "conjectural" and "hypothetical" rather than "actual and imminent."[4]  And none of the Plaintiffs-Appellants have standing as trustees of Pennsylvania's public natural resources under the Environmental Rights Amendment to the Pennsylvania Constitution because the Commission's ban on fracking has not cognizably harmed the trust.

Our holding today is narrow.  The fact that the plaintiffs in this case lack standing to challenge the ban on fracking does not mean that it will go unchallenged.  Indeed, we have already found that at least one party has Article III standing to challenge the ban in federal court.[5]  Plaintiffs-Appellants are also free to seek redress through other means.  They can lobby the Commission to reverse course based on their policy concerns.  They can try to amend the Delaware River Basin Compact through concurrent legislation of the member states.  Or, they can persuade a party with standing to assert the institutional injuries they allege to bring a version of this lawsuit.  What Plaintiffs-Appellants cannot do is seek redress in federal court for broad institutional injuries about which they have no standing to complain.

---

[3] *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953–54 (2019).
[4] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).
[5] *See Wayne Land and Min. Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 524–25 (3d Cir. 2018).

6

Because Plaintiffs-Appellants lack Article III standing to pursue their claims, we will affirm the order of the District Court.

I.[6]

A.

The Delaware River Basin (the "Basin") is the drainage basin of the Delaware River. It consists of large swaths of land in Pennsylvania, Delaware, New Jersey, and New York. In 1961, these four states and the federal government entered into the Delaware River Basin Compact (the "Compact"), an interstate compact aimed at facilitating a unified approach to the "planning, conservation, utilization, development, management and control of the [Basin's] water resources."[7] The Compact created the Delaware River Basin Commission (the "Commission"), a "body politic and corporate" consisting of the governors of the four member states (or their alternates) and a federal representative appointed by the President of the United States.[8] The Commission has a variety of powers, including the power to: establish standards of "planning, design and operation of all projects and facilities in the basin which affect its water resources"; plan, construct, and complete any projects determined to be "necessary, convenient or useful" to the purposes of the Compact; and conduct research

---

[6] Because this case is at the motion to dismiss stage, we accept all factual allegations in the complaint as true. *See N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 (3d Cir. 2015).

[7] JA0327.

[8] JA0328.

7

on water resources and their conservation.[9]  The Commission also has the power to review private projects in the Basin for approval: under Section 3.8 of the Compact, "[n]o project having a substantial effect on the water resources of the basin shall . . . be undertaken by any person, corporation or governmental authority unless it shall have been first submitted to and approved by the [C]ommission."[10]

In 2010, relying on its power of review, the Commission instituted a "*de facto* moratorium" on natural gas extraction in the Basin.[11]  The moratorium remained in place until February 25, 2021, at which time the Commission voted to adopt a regulation formally banning oil and gas extraction through high-volume hydraulic fracturing within the Basin.  The regulation provides: "High volume hydraulic fracturing in hydrocarbon bearing rock formations is prohibited within the Delaware River Basin."[12]  The regulation defines "hydraulic fracturing" as:

> a technique used to stimulate the production of oil and natural gas from a well by injecting fracturing fluids down the wellbore under pressure to create and maintain induced fractures in the hydrocarbon-bearing rock of the target geologic formation.[13]

---

[9] JA0331.
[10] JA0332.
[11] JA0305.
[12] JA0371.
[13] JA0370.

Hydraulic fracturing is considered "high volume" when it uses "a combined total of 300,000 or more gallons of water during all stages in a well completion."[14]  The ban reflected the Commission's determination that fracking "poses significant, immediate and long-term risks to the development, conservation, utilization, management, and preservation of the water resources of the Delaware River Basin and to Special Protection Waters of the Basin."[15]  The Commission further found that:

> Controlling future pollution by prohibiting such activity in the Basin is required to effectuate the [Commission's] Comprehensive Plan, avoid injury to the waters of the Basin as contemplated by the Comprehensive Plan and protect the public health and preserve the waters of the Basin for uses in accordance with the Comprehensive Plan.[16]

Outside of the Basin, fracking is big business.  This is especially true in Pennsylvania, thanks in part to the Marcellus Shale Formation, a "geological configuration housing significant natural gas reserves."[17]  Between 2010 and 2018, "natural gas producers . . . paid approximately $10 billion in royalties directly to Pennsylvania landowners."[18]

---

[14] *Id*.
[15] JA0371.
[16] *Id*.
[17] JA0300.
[18] JA0303.

9

B.

Plaintiffs-Appellants are Pennsylvania State Senators Gene Yaw and Lisa Baker; the Pennsylvania Senate Republican Caucus; and several Pennsylvania towns and counties within the Delaware River Basin: Wayne County, Damascus Township, and Dyberry Township.[19] In early 2021, Plaintiffs-Appellants challenged the ban on fracking by suing the Commission in federal court. Several additional parties then intervened as defendants, including: the Delaware Riverkeeper Network and Maya K. van Rossum, its Executive Director; a collection of Democratic Pennsylvania State Senators; and Bucks and Montgomery Counties. In an Amended Complaint filed in March 2021, Plaintiffs-Appellants allege that the ban: (1) exceeded the Commission's authority under the Compact; (2) violated the Takings Clause of the United States Constitution; (3) unlawfully exercised the power of eminent domain; and (4) violated the Constitution's guarantee of a republican form of government.

Plaintiffs-Appellants allege several injuries stemming from the ban. First, they allege that the ban has "palpably and substantially diminished the legislative powers" of the "Senate Plaintiffs"—the two Pennsylvania state senators and the Senate Republican Caucus.[20] Second, Plaintiffs-Appellants allege that the ban has precluded the "Municipal Plaintiffs"—the Pennsylvania towns and counties within the Basin—from participating in fracking-related economic development "made

---

[19] Carbon County was also a plaintiff below but is not a party to this appeal.
[20] JA0315.

10

available to neighboring areas."[21]  Finally, Plaintiffs-Appellants allege that the ban has interfered with their ability to carry out their fiduciary duties as trustees of Pennsylvania's public natural resources under the Environmental Rights Amendment to the Pennsylvania Constitution (the "ERA").  As a remedy for these injuries, Plaintiffs-Appellants seek declaratory relief.

Defendants-Appellees moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing, among other things, that Plaintiffs-Appellants lacked standing to pursue their claims in federal court.  The District Court agreed, concluding that, "[a]lthough all Plaintiffs argue vigorously that they have standing, they do not."[22]  With regard to the Senate Plaintiffs, the District Court found that: (1) under controlling Supreme Court precedent, individual legislators and party caucuses lack standing to pursue the kinds of generalized legislative injuries alleged in the Amended Complaint; (2) the Senate Plaintiffs lack standing under the ERA because they are not ERA trustees; and (3) even if the Senate Plaintiffs were ERA trustees, they have not alleged a cognizable injury to the trust.  The District Court accordingly dismissed the Amended Complaint with prejudice as to the Senate Plaintiffs.

With regard to the Municipal Plaintiffs, the District Court found that: (1) although these plaintiffs *are* ERA trustees under Pennsylvania law, "[that] status alone does not confer standing"; (2) by only pointing to a "single missed fracking opportunity" twelve years ago, the Municipal Plaintiffs have failed to allege economic injuries that are actual or imminent;

---

[21] JA0302.
[22] JA0016.

11

and (3) the Municipal Plaintiffs have also failed to satisfy the traceability and redressability requirements of Article III standing because of the "numerous factors that control the amount of natural gas that can be extracted from a given place at a given time."[23] The District Court nevertheless found that the Municipal Plaintiffs "might be able to articulate how the [ban] has actually injured them" and accordingly gave them an opportunity to file a Second Amended Complaint.[24] The Municipal Plaintiffs never took that opportunity, however, so the Court eventually dismissed the Amended Complaint with prejudice as to them as well. This timely appeal followed.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's decision to dismiss a complaint for lack of standing.[25] "[W]hen standing is challenged on the basis of the pleadings, we accept as true all material allegations in the complaint, and . . . construe the complaint in favor of the complaining party."[26]

## III.

Plaintiffs-Appellants argue that the District Court erred in rejecting each of their three theories of Article III standing:

---

[23] JA0024.

[24] JA0025.

[25] *N. Jersey Brain & Spine Ctr.*, 801 F.3d at 371 (citing *Baldwin v. Univ. of Pitt. Med. Ctr.*, 636 F.3d 69, 74 (3d Cir. 2011)).

[26] *Id*. (quoting *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996)).

12

(1) legislative, (2) economic, and (3) ERA trustee. We will address each theory in turn. But first, some basics on federal standing.

Article III of the U.S. Constitution endows federal courts with the "judicial Power of the United States."[27] But it limits that power to actual "Cases" or "Controversies."[28] Part of the case-or-controversy requirement is the requirement that plaintiffs have standing to sue.[29] To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must establish three elements: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely redressed by a favorable judicial decision.[30] To show an injury in fact, the "first and foremost of standing's three elements," a plaintiff must show an "invasion of a legally protected interest" that is both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."[31] The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing standing and must "clearly . . . allege facts demonstrating each element."[32]

The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek

---

[27] U.S. CONST. art. III, § 1.

[28] *Id*. § 2.

[29] *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

[30] *Spokeo*, 578 U.S. at 338 (internal quotation marks and citations omitted).

[31] *Id*. at 339 (quoting *Lujan*, 504 U.S. at 560).

[32] *Id*. at 338 (citations and internal quotation marks omitted).

redress for a legal wrong."[33]  And in so doing, it limits the power of federal courts themselves.  It "serves to prevent the judicial process from being used to usurp the powers of the political branches" and "confines the federal courts to a properly judicial role."[34]  As the Supreme Court recently explained, under Article III:

> federal courts do not adjudicate hypothetical or abstract disputes.  Federal courts do not possess a roving commission to publicly opine on every legal question.  Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities.  And federal courts do not issue advisory opinions.[35]

## A.

Plaintiffs-Appellants first argue that the ban on fracking caused the Senate Plaintiffs legislative injuries sufficient to give them Article III standing.  More specifically, they submit that the Senate Plaintiffs have standing because the ban has "deprived [them] of their lawmaking authority relative to millions of Pennsylvanians residing within the 6,000 square miles

---

[33] *Id*. (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 473 (1982) and *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).
[34] *Id*. at 338 (quoting *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013)).
[35] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

of Sovereign territory subsumed by the Basin and any legislation, now or in the future, on this subject has been nullified."[36]

As the District Court found, however, this argument runs headlong into the well-established principle that individual legislators lack standing to assert institutional injuries belonging to the legislature as a whole. A good place to start is the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811 (1997). *Raines* involved a challenge to the Line Item Veto Act of 1996, which gave the President the authority to cancel certain tax and spending measures after they were passed by Congress and signed into law.[37] The plaintiffs were six Members of Congress who had voted against the Act and who argued that it would unlawfully alter the effect of their votes, divest them of their constitutional role in the repeal of legislation, and alter the balance of power between the legislative and executive branches of the federal government.[38] The District Court found that the plaintiffs had standing to challenge the Act and granted summary judgment in their favor.[39]

Hearing the case in an expedited fashion, the Supreme Court held that the plaintiffs lacked standing and accordingly vacated the order of the District Court.[40] The Court noted that the plaintiffs "[had] not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies."[41] Instead, the plaintiffs had alleged that the Act

---

[36] Plaintiffs-Appellants' Opening Brief at 42.

[37] *Raines*, 521 U.S. at 814.

[38] *Id*. at 816.

[39] *Id*.

[40] *Id*. at 813–14.

[41] *Id*. at 821.

15

"cause[d] a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally."[42] Moreover, the plaintiffs "[did] not claim that they [had] been deprived of something to which they *personally* [were] entitled."[43] Rather, their "claim of standing [was] based on a loss of political power, not loss of any private right, which would make the injury more concrete."[44] Overall, the Court found that the plaintiffs lacked Article III standing to challenge the Act in federal court because they "alleged no injury to themselves as individuals . . . [and] the institutional injury they allege[d] [was] wholly abstract and widely dispersed."[45] The Court also "attach[ed] some importance to the fact that [the plaintiffs had] not been authorized to represent their respective Houses of Congress" in the lawsuit.[46]

Similarly, in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), the Supreme Court held that the Virginia House of Delegates, a "single chamber of a bicameral legislature," lacked standing to appeal a court's invalidation of a redistricting plan that the state legislature had passed.[47] Citing *Raines*, the Court held that "[j]ust as individual members lack standing to assert the institutional interests of a legislature . . . a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole."[48] In so

---

[42] *Id.*

[43] *Id.* (emphasis in original).

[44] *Id.*

[45] *Id.* at 829.

[46] *Id.*

[47] *Bethune-Hill*, 139 S. Ct. at 1950.

[48] *Id.* at 1953–54.

holding, the Court noted that the Virginia Constitution allocated redistricting authority to the "General Assembly," of which "the House constitute[d] only a part."[49]  The Court also pointed out that it "ha[d] never held that a judicial decision invalidating a state law as unconstitutional inflicts a discrete, cognizable injury on each organ of government that participated in the law's passage."[50]

By contrast, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015), the Supreme Court held that the Arizona Legislature as a whole had standing to challenge the constitutionality of a voter initiative that transferred its redistricting authority to an independent redistricting commission.[51]  The Court noted that unlike the Members of Congress in *Raines*, the Arizona Legislature "[was] an institutional plaintiff asserting institutional injury."[52]  The problem in *Raines*, the Court explained, was that the plaintiffs were "*individual Members* of Congress" who could not "tenably claim a personal stake in the suit" because the institutional injury at issue "scarcely zeroed in on any individual Member."[53]  The Arizona Legislature had also obtained "authorizing votes in both of its chambers" before initiating its lawsuit, further distinguishing the case from *Raines*.[54]

---

[49] *Id*. at 1953.

[50] *Id*.

[51] *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 793 (2015).

[52] *Id*. at 802.

[53] *Id*. at 801–802 (emphasis in original) (internal quotation marks and citations omitted).

[54] *Id*.

Applying *Raines* and its progeny, several of our sister circuits have also found that individual legislators lack standing in cases involving institutional injuries. In *Alaska Legislative Council v. Babbitt*, 181 F.3d 1333 (D.C. Cir. 1999), for example, the D.C. Circuit held that the Alaska Legislative Council and seventeen members of the Alaska State Legislature lacked standing to challenge a federal law that regulated the taking of fish and wildlife on federal lands within the state.[55] Among other things, the plaintiffs alleged that the law had "interfered with their state duties" and "nullified their legislative prerogatives regarding fish and wildlife management."[56] The Court held that these injuries were insufficient to give the legislators Article III standing because, "[w]hile state legislation or regulations in conflict with [a] federal statute or federal regulations may be unenforceable . . . that type of injury does not entitle individual legislators to seek a judicial remedy."[57]

Likewise, in *Kerr v. Hickenlooper*, 824 F.3d 1207 (10th Cir. 2016), the Tenth Circuit held that a group of legislators from the Colorado General Assembly lacked standing to challenge a provision of the Colorado Constitution that required voter approval for certain tax increases.[58] The Court held that the injury alleged by the legislator-plaintiffs—interference with their powers of taxation and appropriation—was institutional because it was "based on [a] loss of legislative power that necessarily impact[ed] all members of the General

---

[55] *Babbitt*, 181 F.3d at 1335–36.
[56] *Id*. at 1337.
[57] *Id*. at 1338.
[58] *Kerr*, 824 F.3d at 1211–12.

18

Assembly equally."[59]  And the Court found that, unlike in *Arizona State Legislature*, the plaintiffs in *Kerr* did not have standing to assert such institutional injuries because the state legislature had not authorized them to do so.[60]

This case is no different.  As in *Raines*, *Bethune-Hill*, *Babbitt*, and *Kerr*, the legislative injuries that the Senate Plaintiffs allege are "quintessentially 'institutional.'"[61]  The Senate Plaintiffs allege that the ban on fracking:

- "suspends law within the Commonwealth—a power reposed exclusively in the General Assembly";[62]

- "displaced and/or suspended the Commonwealth's comprehensive statutory scheme within the Basin";[63]

- "attempted to exercise legislative authority exclusively vested in the General Assembly";[64]

- "wholly nullifies any present or future legislative action purporting to adopt any laws inconsistent with the prohibition";[65]

---

[59] *Id*. at 1215.
[60] *Id*. at 1216.
[61] JA0017.
[62] JA0306.
[63] *Id*.
[64] JA0307.
[65] *Id*.

19

- "deprives over five million citizens of the Commonwealth residing within the Basin of the right to be governed by laws enacted by their duly-elected representatives";[66]

- "significantly dilutes the right of citizens in the Commonwealth . . . to choose their own officers for governmental administration";[67] and

- "palpably and substantially diminishes the legislative powers of the Senate Plaintiffs."[68]

These are classic examples of institutional injuries because they sound in a general loss of legislative power that is "widely dispersed" and "necessarily damages all [members of the General Assembly] . . . equally."[69]  In other words, the Senate Plaintiffs "have alleged no injury to themselves as individuals"—only injury to the legislature and the commonwealth of which they are a part.[70]  And just as in *Raines*, the Senate Plaintiffs have not been authorized to represent the interests of these institutions in court.  Under Pennsylvania law, the Attorney General is the party responsible for representing the Commonwealth in civil suits, not individual legislators.[71]  Nor has the

---

[66] *Id.*

[67] JA0308.

[68] JA0315.

[69] *Raines*, 521 U.S. at 821, 829.

[70] *Id.* at 829.

[71] *See* 71 Pa. Stat. § 732-204(c) (West 2022) ("The Attorney General shall represent the Commonwealth and all

20

Pennsylvania General Assembly authorized the Senate Plaintiffs to represent it in this matter. At best, the Senate Plaintiffs speak for the majority of the Pennsylvania Senate, which is only one of two chambers of the General Assembly. That is not enough to give them standing, because "[j]ust as individual members lack standing to assert the institutional interests of a legislature . . . a single [chamber] of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole."[72]

Plaintiffs-Appellants make several arguments in response. For one, they argue that the legislative standing caselaw upon which the District Court relied reflects prudential concerns that are unmoored from the traditional requirements of Article III. We do not think there is anything anomalous about the rule that individual legislators lack standing to assert institutional injuries, however. Instead, we think this rule flows naturally from bedrock standing requirements, including the requirement that plaintiffs have an injury that is *particularized to them*, meaning one that affects them in a "personal and individual way."[73] Like the Members of Congress in *Raines*, the Senate Plaintiffs lack a particularized injury because the ban on fracking affects every member of the General Assembly equally and does not "single[] [them] out for specially

Commonwealth agencies . . . in any action brought by or against the Commonwealth or its agencies.").

[72] *Bethune-Hill*, 139 S. Ct. at 1953–54.

[73] *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).

unfavorable treatment."[74]  The rule that individual legislators cannot assert institutional injuries also follows from the principle that, in general, "[a] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."[75]

In arguing to the contrary, Plaintiffs-Appellants are the ones advancing a position unmoored from Article III.  Under their theory of standing, "*any* individual legislator would have standing to challenge *any* federal statute or regulation . . . that, under the Constitution's Supremacy Clause, has a preemptive effect on state lawmaking."[76]  Article III does not sweep so broadly.

Plaintiffs-Appellants also argue that *Raines* is inapplicable because it involved federal separation-of-powers concerns that are absent in lawsuits brought by state officials.  But decisions following *Raines* have made clear that its reasoning is not limited to cases involving federal parties.  In *Bethune-*

---

[74] *Raines*, 521 U.S. at 821; *see also Babbitt*, 181 F.3d at 1337 (holding that the plaintiffs lacked standing because the injuries they alleged were not "particularized to them"); *Kerr*, 824 F.3d at 1216 (holding that the plaintiffs lacked a "personal stake in the suit") (internal quotation marks and citations omitted).

[75] *Penn. Psych. Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 (3d Cir. 2002) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)); *see also Bethune-Hill*, 139 S. Ct. at 1953 (describing a "mismatch" between the body seeking to litigate and the body to which the allegedly diminished power belonged).

[76] Brief of Democratic State Senators and Bucks and Montgomery Counties at 3 (emphasis in original).

*Hill*, for example, the Supreme Court relied on *Raines* in holding that a *state* legislative plaintiff—the Virginia House of Delegates—lacked standing to assert interests belonging to the Virginia Legislature as a whole.[77] And although the Court in *Arizona Independent Redistricting Commission* found that the Arizona Legislature had standing to sue, the distinction between state and federal parties was not central to its analysis. Indeed, in holding that the Arizona legislature had standing as an "institutional plaintiff asserting an institutional injury," the Court was explicitly applying the analytical framework from *Raines* to a state dispute.[78]

Plaintiffs-Appellants also invoke the Supreme Court's 1939 decision in *Coleman v. Miller*, 307 U.S. 433 (1939). There, twenty-four members of the Kansas state legislature sought a writ of mandamus in federal court after the legislature ratified a proposed amendment to the U.S. Constitution.[79] The legislators claimed that the ratification was invalid because the Lieutenant Governor had improperly cast the tiebreaking vote.[80] Among other things, the respondents argued that the legislators lacked standing to pursue relief in federal court.[81] Rejecting this argument, the Court found that the legislators had standing because their votes, which had been "overridden and virtually held for naught," would have been sufficient to defeat ratification if not for the Lieutenant Governor's

---

[77] *Bethune-Hill*, 139 S. Ct. at 1953–54.
[78] *Ariz. State Legislature*, 576 U.S. at 802.
[79] *Coleman*, 307 U.S. at 435–36.
[80] *Id.*
[81] *Id.* at 437.

actions.[82]   The Supreme Court later explained that *Coleman* stands "at most" for the narrow proposition that:

> legislators whose votes would have been suffi-
> cient to defeat (or enact) a specific legislative Act
> have standing to sue if that legislative action goes
> into effect (or does not go into effect), on the
> ground that their votes have been completely
> nullified.[83]

As the District Court rightly found, *Coleman* does not help Plaintiffs-Appellants because they fail to identify a specific legislative act that would have passed (or been defeated) but for the alleged usurpation of legislative power caused by the Commission's ban on fracking.  Plaintiffs-Appellants point to "Act 13," a law passed by the General Assembly in 2012 to regulate natural gas extraction in the Commonwealth.[84]   But they fail to explain how the ban on fracking (or the moratorium that preceded it) affected the passage of Act 13 in a way that would give them standing under the vote nullification theory endorsed in *Coleman*.  And if Plaintiffs-Appellants are simply claiming an interest in Act 13's continued vitality, that is a generalized grievance that does not give them standing in federal court.[85]

---

[82] *Id*. at 438.

[83] *Raines*, 521 U.S. at 823.

[84] JA301.

[85] *See Russell v. DeJongh*, 491 F.3d 130, 135 (3d Cir. 2007) ("[O]nce a bill has become law, a legislator's interest in seeing that the law is followed is no different from a private citizen's interest in proper government.").

24

Finally, Plaintiffs-Appellants point to several state court decisions in Pennsylvania holding that individual legislators have a legally protected interest in "forestalling the usurpation of the state's lawmaking power."[86] In *Fumo v. City of Philadelphia*, 972 A.2d 487, 502 (Pa. 2009), for example, the Supreme Court of Pennsylvania held that individual legislators had standing in state court to pursue claims based on "the effectiveness of their legislative authority and their vote." The fact that a party has standing in state court does not mean that they have standing in federal court, however. As the Seventh Circuit recently clarified, Article III standing "limits the power of *federal* courts and is a matter of *federal* law. It does not turn on state law, which obviously cannot alter the scope of the federal judicial power."[87] We have likewise explained that, "even if Pennsylvania state law would have afforded appellants standing if they had brought [an] action in state court, we must ensure that they satisfy the federal requirements for standing as well."[88] To see that these requirements often differ, one must look no further than the *Fumo* decision itself, which contrasted Pennsylvania's prudential standing doctrine with the constitutional demands of Article III.[89] Moreover, even if *Fumo* showed that the Senate Plaintiffs have suffered an "invasion of a legally protected interest" under Pennsylvania law, that is only one part of the injury-in-fact requirement.[90] To have standing in federal court, the Senate Plaintiffs also need to

---

[86] Plaintiffs-Appellants' Opening Brief at 42.

[87] *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.2d 722, 730–31 (7th Cir. 2020) (Barrett, J.) (emphasis in original).

[88] *Goode v. City of Philadelphia*, 539 F.3d 311, 321 (3d Cir. 2008).

[89] *Fumo*, 972 A.2d at 500 n.5.

[90] *Spokeo*, 578 U.S. at 339.

allege injuries that are concrete and particularized.[91]  Because they fail to do so for the reasons we have just discussed, the Senate Plaintiffs' alleged legislative injuries do not give them standing.[92]

B.

Plaintiffs-Appellants also argue that the Municipal Plaintiffs have standing based on economic injuries that they suffered, and are continuing to suffer, as a result of the ban. This is Plaintiffs-Appellants' most straightforward theory of standing, because "financial harm is a classic and paradigmatic

---

[91] *Id.*

[92] To be clear, the fact that the individual legislators in this case lack standing does not mean that the same will be true in other cases.  As the Tenth Circuit explained in *Kerr*, "[a]n individual legislator certainly retains the ability to bring a suit to redress a *personal* injury, as opposed to an *institutional* injury.  For example, if a particular subset of legislators was barred from exercising their right to vote on bills, such an injury would likely be sufficient to establish a personal injury."  *Kerr*, 824 F.3d at 1216 (emphasis added); *see also Raines*, 521 U.S. at 821 (suggesting a different outcome if the plaintiffs had been "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies").  The bottom line is that "[l]egislators, like other litigants in federal court, must satisfy the jurisdictional prerequisites of Article III standing," *DeJongh*, 491 F.3d at 133, including the need for a "personal stake in the dispute," *Raines*, 521 U.S. at 380 (internal quotation marks omitted).

form of injury in fact."[93]  We nevertheless agree with the District Court that this theory of standing also fails because the economic injuries the Municipal Plaintiffs allege are either too old or too speculative to support the relief that they are seeking.

"Injury-in-fact is not Mount Everest," and an "identifiable trifle of injury" will suffice.[94]  That said, to have an injury-in-fact for standing purposes, a plaintiff must have an injury that is "actual or imminent, not conjectural or hypothetical."[95]  For this reason, we have explained that "[p]laintiffs do not allege an injury-in-fact when they rely on a chain of contingencies or mere speculation."[96]  In *Finkelman v. National Football League*, 810 F.3d 187 (3d Cir. 2016), for example, we considered whether a plaintiff had standing to sue the National Football League ("NFL") based on the theory that he paid a higher price for Super Bowl tickets because the NFL restricted the number of tickets it released to the public, driving up prices on the resale market.[97]  Although this theory of standing appeared promising "[a]t first blush," it failed under closer examination because the complicated economics of the resale market meant that "while it *might* [have been] the case that the NFL's withholding increased ticket prices on the resale market, it might

---

[93] *Cottrell v. Alcon Laby's*, 874 F.3d 154, 163 (3d Cir. 2017) (cleaned up).

[94] *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (internal quotation marks and citations omitted).

[95] *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

[96] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (citations and internal quotation marks omitted).

[97] *Id.* at 200.

*also* [have been] the case that it had *no* effect."[98]  We ultimately found that the plaintiff lacked standing because we could "only speculate" about the price effects of the NFL's actions and "speculation is not enough to sustain Article III standing."[99]

Moreover, "a plaintiff must demonstrate standing separately for each form of relief sought."[100]  When a plaintiff seeks retrospective (backward-looking) relief in the form of money damages, they can establish standing through evidence of a past injury.[101]  But when a plaintiff seeks *prospective* (forward-looking) relief in the form of an injunction or a declaratory judgment, they must show that they are "likely to suffer *future* injury."[102]  The future injury must also be "imminent," meaning that it is "certainly impending" rather than just merely "possible."[103]

In their Amended Complaint, Plaintiffs-Appellants allege that, "[a]lthough [the] Municipal Plaintiffs' low population density and terrain renders them particularly well-suited

---

[98] *Id*. (emphasis in original).

[99] *Id*.

[100] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 185 (2000).

[101] *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210–11 (1995).

[102] *McNair v. Synapse Grp. Inc*, 672 F.3d 213, 223 (3d Cir. 2012) (emphasis added) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)); *see also CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 628 (3d Cir. 2013) (explaining that declaratory relief is, by definition, "prospective in nature").

[103] *Clapper*, 568 U.S. at 409 (internal quotation marks and citations omitted) (emphasis omitted).

for natural gas exploration and extraction," the ban on fracking has excluded them "from participating in the economic development made available to neighboring areas."[104]  Between 2006 and 2017, for example, a single natural gas producer paid over $1 billion in royalties to landowners in Susquehanna County, which adjoins Plaintiff-Appellant Wayne County but is located outside of the Basin.  Plaintiffs-Appellants also allege that before the Commission's moratorium on natural gas extraction in 2010, "countless landowners within the Basin had negotiated and/or executed leases with natural gas producers" that were later rendered valueless.[105]  For example, "a group of landowners in Wayne County expended approximately $750,000 in legal fees to negotiate a lease that was estimated to yield over $187 million during its term, but as a result of the Commission's moratorium, the contract became ineffectual and . . . was terminated."[106]  Finally, Plaintiffs-Appellants allege that, under Act 13, municipalities in which unconventional natural gas wells are located have received sizable distributions from the Well Fund, a statewide fund comprised of fees from the development of unconventional wells.   In 2019, for example, municipalities throughout Pennsylvania received over $109 million in distributions, including $5.7 million to Susquehanna County.

The District Court found these allegations insufficient to give the Municipal Plaintiffs standing.  The Court found that the Municipal Plaintiffs have failed to allege that fracking would likely occur within their borders but for the Commission's ban and that the "theoretical possibility" of missed

---

[104] JA0302.
[105] JA0303.
[106] *Id.*

29

fracking opportunities does not give them standing.[107]   The Court also found that the "single missed fracking opportunity" cited in the Amended Complaint does not give the Municipal Plaintiffs standing because that potential project occurred over 12 years ago and "obviously [does] not show that some twelve years later, any of the Municipalities is suffering a current injury."[108]

On appeal, Plaintiffs-Appellants argue that the "single missed fracking opportunity" in Wayne County is enough to give them standing because they need only allege a "trifle of injury."[109]  But this argument overlooks the fact that Plaintiffs-Appellants are seeking prospective rather than retrospective relief.[110]  As a consequence, they cannot base their standing on past injuries.[111]   The District Court was therefore correct to conclude that while the missed fracking opportunity in Wayne County might have given the Municipal Plaintiffs standing twelve years ago, it does not do so today.

The only remaining question is whether the Municipal Plaintiffs have sufficiently alleged the kind of ongoing or imminent economic harm needed to sustain their request for prospective relief.  Like the District Court, we think not.  Although the Municipal Plaintiffs have identified fracking projects that are currently underway in neighboring counties, they have

---

[107] JA0024.

[108] *Id*.

[109] Plaintiffs-Appellants' Opening Brief at 63 (quoting *Bowman*, 672 F.2d at 1145).

[110] Specifically, Plaintiffs-Appellants are seeking a declaratory judgment.

[111] *McNair*, 672 F.3d at 223.

failed to identify any recent projects within *their* borders that would have moved forward if not for the ban.[112] The Municipal Plaintiffs have also failed to identify any projects that would be ready and able to proceed in the near future if the ban is lifted.[113] Instead, they have made only general allegations about the suitability of their terrain and the presence of natural gas reserves without mentioning "the viability of or actual interest in extraction."[114] As one group of Defendants-Appellees puts it, the Municipal Plaintiffs have failed to allege "that the reserves within their borders could feasibly be extracted via fracking, or that but for the [ban], a permit would have been

---

[112] Perhaps recognizing this problem, Plaintiffs-Appellants ask us to take judicial notice of a potential fracking project in Wayne County that is the subject of a separate case in the United States District Court for the Middle District of Pennsylvania. But Plaintiffs-Appellants did not plead any facts about this project in their Amended Complaint, and the Municipal Plaintiffs did not file a Second Amended Complaint even after the District Court gave them the opportunity to do so. We "generally do not consider arguments raised for the first time on appeal" and will not do so here given the multiple opportunities Plaintiffs-Appellants had to raise this project in support of their claim to standing. *Orie v. Dist. Att'y Allegheny Cnty.*, 946 F.3d 187, 195 (3d Cir. 2019) (internal quotation marks and citations omitted).
[113] *See Ellison v. Am. Bd. of Orthopedic Surgery*, 11 F.4th 200, 206 (3d Cir. 2021) (explaining that where a plaintiff has allegedly been denied a benefit or opportunity, evidence that they are "able and ready" to seek the benefit "lends concrete substance and imminence to an injury that would otherwise be purely hypothetical.").
[114] JA0024.

issued and withstood likely legal challenges, [or] that fracking would in fact occur, or that the fracking would result in actual extraction of natural gas and [the] payment of fees into the Well Fund."[115]  This lack of detail is fatal to the Municipal Plaintiffs' standing, because it renders their economic injuries "hypothetical" and "conjectural" rather than "actual or imminent."[116]

At most, the Municipal Plaintiffs have shown a *possibility* of future economic injury through the loss of hypothetical future fracking projects within their borders.  But that is not enough to give them standing, because "[a]llegations of *possible* future injury are not sufficient."[117]  The Municipal Plaintiffs accordingly lack standing based on economic injuries, as the District Court found.

C.

Finally, Plaintiffs-Appellants argue that both the Senate and Municipal Plaintiffs have standing based on injuries they

---

[115] Brief of Democratic State Senators and Bucks and Montgomery Counties at 52.

[116] *Spokeo*, 578 U.S. at 339; *see also Lujan*, 504 U.S. at 564 (stating that "some day" intentions without "any description of concrete plans" or "any specification of *when* the some day will be" do not give rise to an actual or imminent injury for standing purposes); *MGM Resorts Int'l Glob. Gaming Develop., LLC v. Malloy*, 861 F.3d 40, 42–43 (2d Cir. 2017) (holding that MGM lacked standing to challenge a Connecticut law because it "failed to allege any specific plans to develop a casino in Connecticut," rendering the alleged harm "too speculative to support Article III standing").

[117] *Clapper*, 568 U.S. at 409 (emphasis in original).

suffered as "trustees of [Pennsylvania's] natural resources" under the ERA.[118]  Although this is Plaintiffs-Appellants' most legally creative theory of standing, it too falls short.

Pennsylvania voters ratified the ERA in 1971 after decades of "virtually unrestrained exploitation" of the state's natural resources led to "destructive and lasting consequences not only for the environment but also for the citizens' quality of life."[119]  The Amendment provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come.  As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.[120]

The first sentence of the ERA is a "prohibitory clause" that limits the state's ability to infringe on citizens' right to clean air, pure water, and the preservation of the environment.[121] The second and third sentences create a public trust pursuant to which Pennsylvania's "[public] natural resources are the corpus . . . , the Commonwealth is the trustee, and the people are the named beneficiaries."[122]

---

[118] Plaintiffs-Appellants' Opening Brief at 61–62.

[119] *Pa. Env't Def. Found. v. Commonwealth*, 161 A.3d 911, 918–19 (Pa. 2017) ("*PEDF*").

[120] PA. CONST. art. I, § 27.

[121] *PEDF*, 161 A.3d at 931.

[122] *Id.* at 931–32.

Plaintiffs-Appellants' argument for standing under the ERA proceeds in two parts. First, they argue that because the Commonwealth's trustee obligations extend to "all agencies and entities of the Commonwealth government, both statewide and local," they are all trustees of Pennsylvania's public natural resources under the ERA.[123] Second, they argue that the Commission's ban on fracking has harmed them in their roles as ERA trustees because it has "precluded [them] from exercising their constitutionally enshrined fiduciary obligations."[124]

We need not resolve the first issue, because even if we assume that all of the Plaintiffs-Appellants are ERA trustees under Pennsylvania law, they have failed to show that the ban on fracking is causing them, or will imminently cause them, a concrete injury-in-fact in connection with that role. Plaintiffs-Appellants assert that "any attempt by a non-trustee to administer the Trust or take control of its corpus is a *per se* injury" and "[g]iven that the Commission is not a trustee under the ERA, its interference with the Trust's administration is an injury-in-fact."[125] Plaintiffs-Appellants offer no legal support for these broad assertions, however, and they conflict with the understanding that, "under Article III, an injury in law is not an injury in fact."[126] In *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), for example, the Supreme Court held that thousands of class action plaintiffs lacked Article III standing to sue a credit reporting agency under the Fair Credit Reporting Act because the agency's inclusion of inaccurate information

---

[123] *Id*. at 932 n.23.
[124] Plaintiffs-Appellants' Opening Brief at 58–59.
[125] *Id*. at 63.
[126] *TransUnion*, 141 S. Ct. at 2205.

34

in the plaintiffs' internal credit files—while a violation of the Act—did not cause them concrete harm.[127]  In so holding, the Court reiterated that, to be sufficiently concrete for Article III purposes, a plaintiff's injury must be "real, and not abstract."[128] The Supreme Court has also explained that a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement."[129]

That, in a nutshell, is the problem with Plaintiffs-Appellants' ERA trustee theory of standing: it complains of a bare procedural violation divorced from any concrete harm.  Plaintiffs-Appellants allege, for example, the ban on fracking has "interfered with [their] management of the Trust."[130]  But they fail to explain what, exactly, the ban is preventing them from doing.  At their most specific, Plaintiffs-Appellants assert that, as trustees, they may "bring and defend actions that impact the Trust, and take reasonable steps to increase the value of the Trust's assets."[131]  But tellingly, Plaintiffs-Appellants do not allege any specific actions that they are actually trying to bring or defend, or any "reasonable steps" that they are actually trying to take as ERA trustees.  As pled, these injuries are neither concrete nor "actual or imminent"; they are wholly abstract.[132]

Perhaps understanding this, Plaintiffs-Appellants advance one final argument: that the ban on fracking harms the public trust created by the ERA by decreasing fracking

---

[127] *Id*. at 2210.
[128] *Id*. at 2204 (listing cases).
[129] *Spokeo*, 578 U.S. at 341.
[130] JA0308.
[131] JA0296.
[132] *Spokeo*, 578 U.S. at 339.

revenues in Pennsylvania. The idea is that the corpus of the trust includes not only the state's public natural resources, including its oil and gas reserves, but also "any funds derived from the sale or lease of those resources."[133] Plaintiffs-Appellants thus allege that by reducing fracking revenues, the ban has "directly and substantially injured the Trust's corpus."[134]

As several environmental organizations explain in a joint amicus brief, however, this argument fundamentally misunderstands the ERA and would turn it "upside down" if accepted.[135] Plaintiffs-Appellants are arguing that the ERA, a state constitutional amendment intended to protect Pennsylvania's natural resources from exploitation by placing them in a public trust, actually "*requires* the liquidation of public natural resources for cash—that this actually improves the public trust."[136] We disagree. The problem with this argument is that it ignores the explicit purpose of the ERA and mistakes the unique public trust it created for a run-of-the-mill financial trust in which the trustees have a duty to maximize profits. The Supreme Court of Pennsylvania has explained that the purpose of the public trust created by the ERA is not to make money; it is to "conserve and maintain" the state's public natural resources.[137] To promote this purpose, the ERA "imposes two basic duties on the Commonwealth as the trustee."[138] First, "the Commonwealth has a duty to prohibit the degradation,

---

[133] Plaintiffs-Appellants' Opening Brief at 52.
[134] JA0308.
[135] Brief of Environmental Amici at 22.
[136] *Id*. at 23.
[137] *PEDF*, 161 A.3d at 933 n.26 (quoting PA. CONST. art. I, § 27).
[138] *Id*. at 933.

36

diminution, and depletion of [Pennsylvania's] public natural resources, whether these harms might result from direct state action or from the actions of private parties."[139] Second, "the Commonwealth must act affirmatively via legislative action to protect the environment."[140] Importantly, under the ERA, the Commonwealth is not a "mere proprietor" that "deals at arms' length with its citizens, measuring its gains by the balance sheet profits and appreciation it realizes."[141] Instead, it is a "*fiduciary*, measuring its successes by the benefits it bestows upon all citizens in their utilization of natural resources under law."[142]

Plaintiffs-Appellants nevertheless point to the fact that under Pennsylvania caselaw, certain proceeds from natural gas extraction "must remain in the trust and must be devoted to the conservation and maintenance of [Pennsylvania's] public natural resources."[143] But the fact that the ERA requires certain fracking proceeds to remain in the trust does not mean that trustees somehow have a duty to keep fracking. To the contrary, the duty of loyalty requires trustees to "manage the corpus of the trust *so as to accomplish the trust's purposes*," which here is the conservation and maintenance of Pennsylvania's public natural resources.[144] And although it is possible to conceive of

---

[139] *Id.*

[140] *Id.*

[141] *Id.* at 932 (cleaned up).

[142] *Id.* (emphasis added).

[143] Plaintiffs-Appellants' Opening Brief at 52 (quoting *PEDF*, 161 A.3d at 936).

[144] *PEDF*, 161 A.3d at 932 (emphasis added) (citing *Metzger v. Lehigh Valley Tr. & Safe Deposit Co.*, 69 A. 1037, 1038 (1908)).

37

a situation where the sale of trust assets might be necessary to advance the purposes of a conservation trust or save it from insolvency, Plaintiffs-Appellants have not alleged that anything like that is happening here.

When the nature of the public trust created by the ERA is properly understood, it becomes clear that neither the trust nor its corpus is being concretely harmed by the Commission's decision to ban fracking in the Basin. To the contrary, the ban *promotes* the purposes of the trust and *protects* its corpus by preventing Pennsylvania's natural gas reserves, part of the Commonwealth's "public natural resources," from being depleted.[145] Thus, even if Plaintiffs-Appellants were trustees of Pennsylvania's public natural resources under the ERA, they have failed to show that the ban on fracking is causing them harm in that role, let alone the kind of concrete injury-in-fact required to give them standing in federal court. For this reason, Plaintiffs-Appellants' final theory of standing also fails.

IV.

Because we agree with the District Court that Plaintiffs-Appellants lack standing to challenge the Commission's ban on fracking, we will affirm.

---

[145] PA. CONST. art. I, § 27.