IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2026 Session

## MAYOR LEE HARRIS ET AL. V. GOVERNOR BILL LEE ET AL.

**Appeal from the Chancery Court for Davidson County**
No. 25-1461      Patricia Head Moskal, Chancellor

_____

### No. M2025-01915-COA-R9-CV
_____

The plaintiffs sued various state officials to enjoin the deployment of Tennessee National Guard troops in support of the President's Memphis Safe Task Force. The trial court granted a temporary injunction, and the state defendants filed a Tenn. R. App. P. 9 motion seeking permission to appeal, which the Court of Appeals granted. Finding that the plaintiffs lack standing, we reverse the issuance of the injunction.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., C.J., and JEFFREY USMAN, J., joined.

Jonathan Skrmetti, Attorney General and Reporter, J. Matthew Rice, Solicitor General, Zachary R. Clark, Senior Deputy Attorney General, Harrison G. Kilgore, Senior Assistant Attorney General, Cody N. Brandon, Deputy Attorney General, Aaron L. Bernard, Assistant Solicitor General, and Thomas C. Archibald, Honors Fellow, for the appellants, Governor, State of Tennessee, Commissioner, Tennessee Department of Military, and State Attorney General.

William J. Harbison, II, Robert D. Boon, and Micah N. Bradley, Nashville, Tennessee, William D. Bardwell, Yenisey Rodriguez, Joshua M. Salzman, Brian D. Netter, Benjamin R. Farley, and Efren C. Olivares, Washington, D.C., for the appellees, Shelby County Mayor Lee Harris, Henri E. Brooks, G.A. Hardaway, Sr., Gabby Salinas, J.B. Smiley, Jr., Erika Sugarmon, and Jeffrey Paul Yarbro.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

This action is against state officials for calling out the Tennessee National Guard to support the Memphis Safe Task Force's law enforcement actions. The plaintiffs, the Mayor of Shelby County, two members of the Shelby County Commission, a member of the Memphis City Council, two members of the Tennessee House of Representatives, and one member of the Tennessee Senate, asked the Davidson County Chancery Court to hold unlawful and enjoin the defendants' deployment of the Tennessee National Guard to Memphis.

The background of this lawsuit is fairly straightforward. Memphis has a crime problem and is the most violent city in the country. President Trump created the Memphis Safe Task Force, consisting of 31 federal, state and local agencies, on September 15, 2025. President Trump also instructed the Secretary of War to "make available National Guard units of Tennessee to support public safety and law enforcement operations." The Attorney General and the Secretary of Homeland Security were directed to "request such National Guard support as necessary and appropriate" to support the Task Force. The Secretary of War requested under Title 32[1] of the United States Code that the Governor send the Tennessee National Guard to Memphis to support the Task Force. Governor Lee mobilized the National Guard "consistent with Tenn. Code Ann. § 58-1-106(a)."[2]

The plaintiffs filed the complaint on October 17, 2025, and the chancery court held a hearing on the motion for temporary injunction on November 3, 2025. On November 21, 2025, the Chancellor issued her order. The Chancery Court found that Tenn. Code Ann. § 1-3-121 waived sovereign immunity to allow these government officials to challenge the government's action. The court further found that this was a "public rights" case and that the plaintiffs had to and did establish the three elements of standing: a distinct and palpable injury not in common with the general public (arising from their positions as elected and

---

[1]  32 U.S.C. § 502(f)(2)(A).

[2]  According to the Chancellor's order of November 21, 2025,

> The record does not contain any written request from the President, the Secretary of the Department of War, the Secretary of the Department of Homeland Security, the United States Attorney General, or the Department of Justice, to Governor Lee for activation of Tennessee National Guard personnel to support the Memphis Safe Task Force.

> The record also does not contain any written order, command, memorandum, or other writing by Governor Lee ordering the activation of Tennessee National Guard personnel for deployment to Memphis to support the Memphis Safe Task Force, or state and local law enforcement agencies in Memphis.

serving officials), a causal connection between their alleged injuries and the defendants' deployment of the National Guard to Memphis, and alleged injuries that are capable of being redressed by a favorable order for declaratory or injunctive relief. The court also found that the political question doctrine did not apply. Lastly, the court addressed the temporary injunction factors and found a temporary injunction to be appropriate.

The defendants sought an appeal under Tenn. R. App. P. 9, which was granted. The issues are:

I. Whether Plaintiffs—who sue in their official capacity as government officials—are "affected person[s]" that benefit from Tenn. Code Ann. § 1-3-121's waiver of sovereign immunity.

II. Whether Plaintiffs have standing to challenge the Governor's deployment of the National Guard to support the Memphis Safe Task Force.

III. Whether the Governor's deployment of the National Guard to support the Memphis Safe Task Force violates Tenn. Code Ann. § 58-1-106.

IV. Whether Plaintiffs are likely to succeed on Count I of their Complaint, which asserts that the challenged National Guard deployment violates Article III, Section 5 of the Tennessee Constitution.

V. Whether Tenn. Code Ann. § 20-18-101(a) requires this action to be heard and determined by a three-judge panel.[3]

ANALYSIS

After considering the excellent briefs and oral arguments from by both sides, we have concluded that there is one issue that clearly resolves this case. That issue is standing. Standing is a threshold inquiry that determines "'whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.'" *City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)); *see also Case v. Wilmington Tr.*, N.A., 703 S.W.3d 274, 281 (Tenn. 2024). The applicable test for standing depends on whether the injury is a private rights claim or a public rights claim. *Wygant v. Lee*, ---S.W.3d ----, No. M2023-01686-SC-R3-CV, 2025 WL 3537313, at *16 (Tenn. Dec. 10, 2025). In *Wygant*, the plaintiff was "suing government officials and asking the judiciary to grant equitable relief against them." *Id.* at *17. The Supreme Court described it as "a quintessential public rights claim." *Id*. The same is true here. The plaintiffs are suing state officials for injunctive relief.

---

[3] This Court added this question. Both sides respond by saying that the answer is "no" because the complaint carefully avoids challenging the constitutionality of a statute or executive order.

The three-part standing test for public rights claims "requires plaintiffs to show (1) an injury in fact (2) that is fairly traceable to the challenged conduct and (3) is capable of being redressed by a favorable judicial decision." *Id.* at *18. "[A] plaintiff must show an injury that is 'distinct and palpable.'" *Id.* (quoting *City of Memphis*, 414 S.W.3d at 98 (quoting *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006))). The injury also must be "actual or imminent." *Wilmington Tr.*, 703 S.W.3d at 283 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

"The plaintiff bears the burden of establishing these elements by the same degree of evidence as other matters on which the plaintiff bears the burden of proof. The degree of evidence depends, of course, upon the stage of litigation at which standing is challenged." *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d 141, 149 (Tenn. 2022) (citation modified). As for the stage of the proceedings in the present case, the ruling being appealed is a grant of a temporary injunction. Under Tennessee Rule of Civil Procedure 65.04(2),

> [a] temporary injunction may be granted during the pendency of an action if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.

TENN. R. CIV. P. 65.04(2).

As noted above, there are seven plaintiffs in the present case; the trial court concluded that all seven have standing. The plaintiffs are Tennessee State Representatives G.A. Hardaway, Sr. and Gabby Salinas; Tennessee State Senator Jeff Yarbro; Shelby County Commissioners Henri E. Brooks and Erica Sugarmon; City of Memphis Councilmember J.B. Smiley, Jr.; and the Mayor of Shelby County Lee Harris. Each of the plaintiffs brought suit in his or her respective official capacities. Representative Salinas and Senator Yarbro also filed suit in their personal capacities, invoking taxpayer standing status.

In order to better assess whether each of the plaintiffs has standing, it is helpful to consider the standing analysis in four distinct components. First, we address the legislative standing of Tennessee State Representatives Hardaway and Salinas, Tennessee State Senator Yarbro, Shelby County Commissioners Brooks and Sugarmon, and City of Memphis Councilmember Smiley. In assessing whether the requirements for legislative standing are satisfied with respect to these plaintiffs, our discussion at times distinguishes between the legislative standing of the state legislators and the local legislators based upon different considerations that are applicable to the two groups. Second, we consider the standing of County Mayor Harris. Third, we turn our attention to the asserted taxpayer

standing of Representative Salinas and Senator Yarbro. Fourth, we consider the Plaintiffs' policy concern regarding an absence of persons with standing.

A.

While a legislature as an institution has standing as to cognizable institutional injuries to the legislature itself, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015); *Kerr v. Hickenlooper*, 824 F.3d 1207, 1214 (10th Cir. 2016), "individual members lack standing to assert the institutional interests of a legislature." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019). In *Raines v. Byrd,* 521 U.S. 811 (1991), the United States Supreme Court declined to find standing for individual legislators or a small group of legislators where the injury is "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Raines*, 521 U.S. at 821; *see also*, *e.g.*, Jonathan David Shaub, *Interbranch Equity*, 25 U. PA. J. CONST. L. 780, 813 (2023) (noting that *Raines* "held that individual legislators lacked standing to assert a general institutional injury to Congress's constitutional authority"). Thus, in general, individual legislators or a group of legislators do not have standing to advance a claim for institutional injury to the legislature. *See*, *e.g.*, *Va. House of Delegates*, 587 U.S. at 667; *see also*, *e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 58 F.4th 580, 584 (1st Cir. 2023); *Yaw v. Del. River Basin Comm'n*, 49 F.4th 302, 311-16 (3d Cir. 2022); *Blumenthal v. Trump*, 949 F.3d 14, 19-20 (D.C. Cir. 2020); *Comm. on Judiciary of U. S. House of Reps v. McGahn*, 968 F.3d 755, 775 (D.C. Cir. 2020) (noting that "whereas a legislative institution may properly assert an institutional injury, an individual member of that institution generally may not"); *Kerr*, 824 F.3d at 1214 (noting that "individual legislators may not support standing by alleging only an institutional injury").

The United States Supreme Court's decision in *Coleman v. Miller,* 307 U.S. 433 (1939), provides a route around this limitation, but the path provides only "a narrow exception." *Blumenthal*, 949 F.3d at 20 n.3; *see also Lindsey v. Whitmer*, 124 F.4th 408, 413 (6th Cir. 2024). The *Coleman* Court "recognized the standing of 20 state legislators who voted against a resolution ratifying the proposed Child Labor Amendment to the Federal Constitution. The resolution passed, the opposing legislators stated, only because the Lieutenant Governor cast a tie-breaking vote—a procedure the legislators argued was impermissible under Article V of the Federal Constitution." *Va. House of Delegates*, 587 U.S. at 668 (citation omitted). As the United States Supreme Court has stated, "*Coleman* stands 'at most' 'for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at 668–69 (quoting *Raines*, 521 U.S. at 823); *see also Lindsey*, 124 F.4th at 413 (noting that "*Coleman* stands for the narrow proposition that legislators suffer a concrete injury when they command enough votes 'to defeat (or enact) a specific

legislative [a]ct' and their votes would be 'nullified' if the challenged conduct were allowed").

Outside of the *Coleman* exception, for an individual legislator who has not been authorized by the legislature to act on its behalf[4] to have standing, the injury must be an injury to the legislator himself or herself rather than an injury to the institution of the legislature. *See Raines*, 521 U.S. at 820-30. Individual legislators or small groups of legislators do not have standing for institutional injuries that affect all members of the legislature equally. *Raines*, 521 U.S. at 811-12; *State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 508 (6th Cir. 2019). As for illustrations of injuries that would be sufficient for standing, an individual legislator denied his or her seat by other members of the legislature suffers such a personal injury. *Raines*, 521 U.S. at 820-21, 829; *see*, *e.g.*, *Powell v. McCormack*, 395 U.S. 486 (1969); *Bond v. Floyd*, 385 U.S. 116 (1966). Similarly, a legislator who is "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies" in a form that constitutes a sufficiently "particularized, concrete, and otherwise judicially cognizable" injury would have an adequate injury for standing purposes. *Raines*, 521 U.S. at 820-21.

As for Tennessee courts specifically, the Tennessee Supreme Court has indicated that "our state constitution is not coincident with the United States Constitution in its constraint on judicial power. Thus, the United States Supreme Court's interpretations as to the limits of federal jurisdiction under Article III are not directly applicable to Tennessee courts' jurisdiction under the Tennessee Constitution." *Wilmingtom Tr.*, 703 S.W.3d at 286 (citation modified). Accordingly, "[w]hile federal precedent has been helpful in addressing questions of justiciability, Tennessee courts are not bound by this precedent, and the entirety of the doctrines as applied by federal courts has never been adopted wholesale into Tennessee law root and branch." *Rutan-Ram v. Tenn. Dep't of Child.'s Servs.*, 698 S.W.3d 540, 550 n.6 (Tenn. Ct. App. 2023). Addressing legislative standing, however, the Tennessee Supreme Court has been, like the United States Supreme Court, demanding. The Tennessee Supreme Court has made plain that "[l]egislators have no special right to

---

[4] Although not present in the instant case, some legislatures have authorized individual legislators or subgroups thereof to act on behalf of the legislative body in bringing suit. *See*, *e.g.*, *Karcher v. May*, 484 U.S. 72 (1987) (indicating that Speaker of the New Jersey House and President of the New Jersey Senate had proceeded as authorized representatives of the House and Senate, representing the New Jersey Legislature, but when they had been removed from those positions they lost the ability to maintain the suit); *State by & through Tenn. Gen. Assembly*, 931 F.3d at 514 (stating that an authorized legislator may act as a representative of the legislative body and may in this role act where the legislative body itself would have had standing to do so); *United States v. AT&T,* 551 F.2d 384, 391 (D.C. Cir. 1976) (concluding that an individual member of Congress who had been authorized to act on behalf of the legislative body had standing); *see also*, *e.g.*, N.C. St. § 1-72.2(b) (providing that the Speaker of the North Carolina House of Representatives and the President Pro Tempore of the Senate "shall jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution").

standing simply by virtue of their status: like other plaintiffs, legislators must establish a distinct, concrete injury in fact." *Darnell*, 195 S.W.3d at 625.

Addressing the standing of the legislative plaintiffs in the present case, the trial court noted that "[t]he county, city, and state legislators allege Defendants' unlawful actions have impeded their respective legislative powers, duties, and rights to debate and vote on the conditions that may warrant National Guard deployment, injuring them in their official capacities."[5] Regarding the injury requirement for standing, the trial court concluded that "each Plaintiff has alleged a distinct and palpable injury that is not hypothetical or predicated upon an interest in common with the general public arising from their positions as publicly elected and currently serving officials."

The injuries asserted by the legislative plaintiffs are diffuse institutional injuries to the legislative bodies, not personal injuries of the individual legislators. To the extent that there is a cognizable injury, any injury in not voting upon or debating the deployment of the Tennessee National Guard is shared equally by the other members of the respective legislative bodies. This is problematic for the legislative plaintiffs' position because, as noted above, "individual members lack standing to assert the institutional interests of a legislature." *Va. House of Delegates*, 587 U.S. at 667; *Raines*, 521 U.S. at 829 (rejecting a claim of standing for six individual legislators based upon diminution of legislative power that was shared equally by all legislative members).

The legislative plaintiffs assert that, as public officials, they have a special role regarding the protection of public rights under Tennessee law. Such a role does not, however, create for the legislative plaintiffs individual standing under the circumstances of the present case. The legislative plaintiffs point to no prior decisions of a Tennessee appellate court in which an individual legislator was permitted to exercise standing for an institutional injury to the legislative body as a whole without the authorization of that legislative body. Yet that is precisely what the individual legislators in the present case are asking this Court to do. Taking such an approach to standing is fraught with serious separation of powers concerns. Under the legislative plaintiffs' approach, *any single legislator* who alleges the governor exceeded his or her authority under a statute or the constitution, even if no one was injured by the governor's actions, could bring suit based on not being able to vote regarding the governor's action. This would place the judiciary in the role of reviewing the legality of the governor's conduct as to anything to which a single legislator objects even if there is no injury. That is not the proper role of courts. The legislative plaintiffs' approach to standing also runs contrary to the basic functioning of a legislative body. By accepting the legislative plaintiffs' standing argument, this court would empower a minority of a legislative body to assume the mantle of the legislative

---

[5] The state legislators refer to Tenn. Code Ann. § 58-1-301 and the local legislators refer to Tenn. Code Ann. § 58-1-106(c).

body itself. The courts, not their colleagues, would be conferring the power to decide the position of the legislature and to act on behalf of the legislature, without any actual authorization by the legislative body to do so. In other words, the plaintiffs' approach to standing invites us to intrude upon both the executive and legislative branches.

Furthermore, at least with regard to the local legislative bodies in the present case, it is clear that the purported injuries do not rise to the level of cognizable institutional injuries that could provide a basis for standing. The declarations of Shelby County Board of Commissioners Brooks and Sugarmon, and Memphis City Councilman Smiley state that a provision of the Tennessee Code empowers the County Board, by resolution, to request the Governor to activate the National Guard to restore law and order. They claim the Governor acted unilaterally in deploying the National Guard to Shelby County, bypassing the authority of the Board of Commissioners and the City Council.

Without so stating, both Shelby County Commissioners and the City Councilman are referring to Tenn. Code Ann. § 58-1-106(c), which provides:

As an alternative and cumulative procedure, upon the request of the governing body of a city or county, and its representation, by resolution duly and regularly adopted, that there is a breakdown of law and order, a grievous breach of the peace, a riot, resistance to process of this state, or disaster, or imminent danger thereof, the governor may order into the active service of the state, for such period, to such extent and in such manner as the governor may deem necessary, all, or any part of, the national guard, or the Tennessee state guard. When the national guard or state guard is called pursuant to resolutions so adopted, the compensation of all members while on duty, shall be paid in the manner and in the amounts set forth in § 58-1-109 for the national guard and § 58-1-411 for the Tennessee state guard, and the county and/or city shall reimburse the military department for all such compensation and for all expenses incurred in connection with such duty. Compensation and expenses shall be paid forthwith upon demand of the adjutant general and upon default of payment, all state funds payable to such defaulting city or county shall be withheld until such time as the full amount has been collected and applied to the satisfaction of the indebtedness. Assistance authorized by, and requested from, competent authority provided only by the Tennessee state guard at the request of a city, county, or other local authority pursuant to this section by volunteers without compensation, shall not require the county or city to reimburse the military department; provided, however, that any travel expenses resulting from the authorized assistance of Tennessee state guard members from outside the requesting city or county shall require reimbursement from the city, county or local authority to the military department, when the department incurs an expense as a result of the

travel for costs directly paid by the department or for travel claims filed by Tennessee state guard members.

Tennessee Code Annotated section 58-1-106(c) presents "an alternative and cumulative procedure," to Tenn. Code Ann. § 58-1-106(a), which states:

The governor shall have the power, in case of invasion, disaster, insurrection, riot, attack, or combination to oppose the enforcement of the law by force and violence, or imminent danger thereof, or other grave emergency, to order into the active service of the state, for such period, to such extent and in such manner as the governor may deem necessary, all or any part of the national guard or the Tennessee state guard, but, in accordance with the constitution, may not call the militia into service except in case of rebellion or invasion, and then only when the general assembly shall declare by law that the public safety requires it.

The word "alternative" when used as an adjective means "offering or expressing a choice," WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY, 25 (1970), while "cumulative" means "increasing by successive additions," *Id*. at 202, and "procedure" means "a particular way of accomplishing something or of acting." *Id*. at 678.[6] Neither Tenn. Code Ann. § 58-1-106(a) nor § 58-1-106(c) mentions the other or purports to supersede the other. Thus, Tenn. Code Ann. § 58-1-106(c) merely presents another independent method of calling out the National Guard in addition to Tenn. Code Ann. § 58-1-106(a).

With respect to the method used for calling out the National Guard, "[t]o perform a mission under Section 502(f)(2)(A), a state [National] Guard's commander in chief—the governor—must receive a request from the President or Secretary of Defense." *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *9 (D.C. Cir. Dec. 17, 2025). This was done. Then, the governor must "evaluate the scope of the requested mission and the availability of the State's guard resources." *Id*. No one argues that this was not done. The governor must "then determine whether the duties to be performed are authorized under state law." *Id*. The Governor determined that the duties fell within the scope of Tenn. Code Ann. § 58-1-106(a). The legislative plaintiffs agree that this is the statutory basis upon which the Governor relied, though they think him mistaken as a matter of statutory and constitutional law.

The injury the Shelby County Commissioners and City Councilman claim is that their right to vote to request that the National Guard be sent to Shelby County/Memphis was bypassed by the Governor's decision to use Tenn. Code Ann. § 58-1-106(a). As noted

---

[6] In defining terms, we have looked to dictionaries contemporaneous with the General Assembly's adoption of this language. *See* 1970 Tenn. Pub. Acts, c. 596, § 5

above, if this is an injury, it is a diffuse institutional injury in which each member of the legislative body equally suffers rather than a personal injury to any individual member. In the present case, however, as to the local legislators, the asserted injury is not ultimately cognizable even as an institutional injury. The only legislative voting right referenced by the local legislators is the right to request the National Guard's deployment. They do not assert that their respective local legislative bodies possess legislative authority to prevent the Governor from taking the action he did. In essence, the local legislative bodies of which they are members can request the Tennessee National Guard's presence, but they reference no legislative authority that enables them to veto a decision by a Governor as to whether to deploy the National Guard. Accordingly, at least with regard to the local legislative bodies, there is not even a cognizable institutional injury that has been asserted.

To summarize, regarding the legislative plaintiffs, the state legislative plaintiffs do not have legislative standing because to the extent that the injury may be cognizable, it is an institutional injury to the General Assembly and not a personal injury to each of the legislators. And, the General Assembly has not authorized them to act on its behalf in bringing suit to address an injury to the institution. Regarding the local legislative plaintiffs, to the extent that the injury may be cognizable, it would be an institutional injury to the Shelby County Commission and the Memphis City Council. And, the local legislative plaintiffs do not assert that they were authorized by their respective legislative bodies to bring suit on behalf of those institutions. Furthermore, the injury to the local legislative bodies is not cognizable as an injury in fact given the alternative and cumulative nature of Tenn. Code Ann. § 58-1-106(c). Ultimately, none of the legislative plaintiffs have standing in their official capacities.

B.

We turn next to consider the standing of Shelby County Mayor Lee Harris. The trial court concluded that Mayor Harris had standing. In reaching this conclusion, the trial court explained "Mayor Harris is Shelby County's elected chief executive and responsible for the administration of the County government, and alleges that Defendants' unlawful action in deploying the National Guard to Memphis and Shelby County impedes his ability to perform his executive duties, has diverted his time and attention away from his regular functions, and is causing financial and reputational harm to the County."

On appeal before this Court, the Plaintiffs argue for Mayor Harris's standing in his official capacity as Shelby County Mayor as follows:

> Mayor Harris—the chief executive of Shelby County—also highlighted several adverse impacts from the deployment, explaining that a "perception of Memphis as an occupied city could depress local economic activity and key industries including those related to dining, travel, tourism, and entertainment." R.I, 101. He also explained that as the county's chief fiscal

- 10 -

officer he is responsible for managing the "financial strain" of the surge, which has required "[r]esources" to be "diverted to prepare for" the "unanticipated and unpredictable amount of criminal justice services required." R.I, 101. Mayor Harris also identified interference with his executive duties, explaining that "the National Guard deployment has also created numerous legal and community relations issues that I have been required to address as Mayor" and which have "prevented me from focusing on other issues of importance, including facilitating the opening of a new high school and a new hospital." R.I, 102.

Much of what Mayor Harris asserts as injuries giving rise to his standing in the present case, however, are injuries not to him or his office but instead purported injuries to Shelby County. For example, he notes financial strains upon the County budget stemming from the National Guard's presence. Mayor Harris is not the County itself, and he does not assert that the Shelby County Charter confers upon him the authority to file lawsuits on behalf of Shelby County. Absent such authority he has no ability to bring suit on behalf of Shelby County. *See Fannon v. City of Lafollette*, 329 S.W.3d 418, 426 (Tenn. 2010). In fact, the Plaintiffs expressly indicate in their briefing on appeal that "Mayor Harris . . . is not purporting to proceed on behalf of Shelby County, but rather, is vindicating executive prerogatives that are vested exclusively in his office." Accordingly, while injuries to Shelby County could potentially provide a basis for asserting that the County itself has been injured, injuries to the County are not a basis for providing standing for Mayor Harris.

Additionally, the Tennessee Supreme Court has observed that all claimants are required to allege injury, but the Court has drawn a distinction between what must be shown to establish standing in a private rights action as opposed to a public rights action. *Wilmington Tr.*, 703 S.W.3d at 291. For a private rights claim, the injury requirement can be satisfied by an "injury in law;"[7] however, for a public rights action, the injury must be "an injury in fact." *Id.* Injuries in fact are "distinct and palpable," either suffered already or imminent, and cannot be "conjectural hypothetical, or based on an interest shared by the general public." *Wygant*, 2025 WL 3537313, at *18. Injuries in fact are concrete and not too abstract. *Darnell,* 195 S.W.3d at 620-21, 625; *see also*, *e.g.*, *Houghton*, 2025 WL 2971436, at *8 (distinguishing private rights claimants from public rights claimants by noting that private rights claimants need not show a concrete injury).

Mayor Harris offered no explanation or support for how diversion of his attention from other important matters to focus upon the presence of the Tennessee National Guard constitutes a cognizable injury in fact. Without a concrete injury, such harms are entirely

---

[7] "An injury in law . . . consists of a violation of the plaintiff's legal rights in some way, or a violation of law that affects him adversely. Stated another way, to have standing, the concept of an injury in law requires a plaintiff to assert injury to a legal interest guaranteed under constitutional, statutory, or common law." *Houghton v. Malibu Boats*, *LLC*, --- S.W.3d ----, No. E2023-00324-SC-R11-CV, 2025 WL 2971436, at *9 (Tenn. Oct. 22, 2025) (citation modified).

too indefinite and non-concrete to qualify as an injury in fact for purposes of standing. *See*, *e.g.*, *Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*, 773 F.3d 243, 246 (11th Cir. 2014) (indicating that lost time and attention being unnecessarily misdirected "sets out an injury that is too abstract and indefinite" to provide a basis for standing); *Cavazzini v. MRS Assocs.*, 574 F. Supp. 3d 134, 143-44 (E.D.N.Y. 2021) (observing that "[c]ourts have found wasted time to support standing when the wasted time is inextricably bound up in a cognizable injury. . . [but] [a] plaintiff who has failed to assert a concrete injury supporting any of his other claims cannot clear the standing threshold by claiming wasted time"); *Lightfootlane v. Me. Dep't of Hum. Servs.*, 522 F.Supp. 2d 296, 298 n.2 (D. Me. 2007) (observing that "[n]early every American citizen could plausibly assert that at some point the government—municipal, county, state, or federal—caused them to waste precious time and expend useless energy. If wasting time and causing effort were the tests for standing to assert a constitutional claim, the case or controversy limitation would be rendered meaningless"). Accordingly, Mayor Harris does not have standing.

## C.

Representative Salinas and Senator Yarbro also asserted before the trial court that they had standing in their individual capacity based upon taxpayer status. The trial court declined to find that they have taxpayer standing. To the contrary, in its order, the trial court determined that "[t]he record . . . at this stage of the proceedings, does not establish that state taxpayer dollars are being expended for the National Guard deployment. See Defs' Ex. 4." Defendants' Exhibit 4, which was referenced by the trial court in its order, is a signed declaration from Jennifer Pontow, who serves as the Tennessee Department of Military's Fiscal Director. Therein, she states the following:

> I am responsible for overseeing all funding agreements between the Tennessee National Guard and the State of Tennessee. This includes managing how funds are authorized and spent under the different agreements. . . .
>
> No Tennessee state taxpayer dollars are being used for the Tennessee National Guard operations currently taking place in Memphis and Shelby County. This is the case because the Tennessee National Guard members supporting this mission are doing so in a Title 32 status, which is federally funded. I validated our Department did not obtain any state funding tied to any additional funding sources for the Memphis/Shelby County mission.

With regard to taxpayer standing, under Tennessee law,

> [t]here are . . . essentially two routes for taxpayers seeking to establish standing in Tennessee. . . . The second route, which has been long recognized by Tennessee courts, significantly departs from conventional federal

- 12 -

taxpayer standing, providing an exception to the rule that a special interest or injury is necessary to establish standing. When traversing this second route, Tennessee courts typically confer standing when a taxpayer (1) alleges a specific illegality in the expenditure of public funds and (2) has made a prior demand on the governmental entity asking it to correct the alleged illegality. *Fannon*, 329 S.W.3d at 427; *see also*, *e.g.*, *Lewis[v. Cleveland Mun. Airport Auth.]*, 289 S.W.3d [808,] 817 (Tenn. Ct. App. 2008) (indicating that "this Court in *City of New Johnsonville* acknowledged that the Supreme Court in *Cobb* required three elements to establish taxpayer standing: (1) taxpayer status; (2) specific illegality in the expenditure of public funds; and (3) the taxpayer has made a prior demand on the governmental entity asking it to correct the claimed illegality"); *Ragsdale [v. City of Memphis]*, 70 S.W.3d [56] 62 (stating that, "[i]n order for Plaintiffs to have standing to challenge the legality of the expenditure of public funds, the Plaintiffs must satisfy three requirements: (1) taxpayer status; (2) an allegation of a specific illegality in the expenditure of public funds; and (3) prior demand").

*Rutan-Ram*, 698 S.W.3d at 562-63.

The Plaintiffs' complaint endeavors to follow this second path under which Tennessee breaks from federal standing principles as a basis for taxpayer standing. In their briefing on appeal, the Plaintiffs note the trial court's finding that they had failed to establish standing on this basis because of an absence of proof that Tennessee taxpayer dollars are being expended on the Tennessee National Guard Deployment. On appeal, the Plaintiffs have not asserted that the trial court has erred, much less developed and supported an argument that the trial court erred with regard to its conclusion as to taxpayer standing. Rather, the full extent of their further discussion of this issue is to assert that, "[e]ven if the Court concludes that Plaintiffs have not shown standing on their other theories, discovery will allow Plaintiffs an opportunity to establish the predicate for this taxpayer standing theory." Accordingly, the Plaintiffs have failed to present this Court with a challenge to the trial court's ruling regarding their taxpayer standing status. *See*, *e.g.*, *Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her."); *cf. Dominy v. Davidson Cnty. Election Comm'n*, No. M2022-00427-COA-R3-CV, 2023 WL 3729863, at *4 (Tenn. Ct. App. May 31, 2023).

## D.

Finally, the plaintiffs raise a policy concern that no one may have standing to challenge the Governor's actions. Explaining their concern as to the potential consequences of no one having standing, the Plaintiffs assert:

[I]t bears emphasis that the implications of Defendants' arguments are deeply troubling. On their telling, no one has the capacity to challenge the Governor's authority to militarily occupy an American city. If the Governor sends tanks down Beale Street, no one could object. Closing the courthouse doors in this manner would not, as Defendants suggest, demonstrate due respect for a coordinate branch of government. Rather, it would constitute an abdication of the judiciary's own vital role under the separation of powers.

We do not understand the position of the Defendants to be that no one has standing, and that is certainly not the position of this Court. That the Plaintiffs in the present case do not have standing does not mean that no one has standing. Six of the seven plaintiffs in this action are legislators who are endeavoring to assert legislative institutional injuries on behalf of legislative bodies that have not authorized them to do so. The final plaintiff is a county mayor who does not purport to have authority to bring suit on behalf of the county while his purported injuries are primarily those suffered not by him or his office but instead by the county itself. His other injuries, distraction and loss of time, under the circumstances of this case, are non-cognizable. Our conclusion is not that no one has standing. It is, instead, that these individuals lack standing.

CONCLUSION

The judgment of the trial court is reversed. Costs of this appeal are assessed against the appellants jointly, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE